

**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI** LLP

One Speedwell Avenue
P.O. Box 1981
Morristown, NJ  07962
(973) 538-0800
Fax (973) 538-1984

# FAX COVER SHEET

| | |
|---|---|
| Date: | December 15, 2006 |
| From: | Michael R. O'Donnell |
| User ID #: | 0232 |
| Attorney #: | 0232 |
| C/M #: | |
| Re: | Potential Assignment of Mortgage between Sky Land Investments, LLC and TTIG, LLC and/or TTIG, LLC's Assignee on the "Property" Located at 41-81 Clark Road, Bernardsville, New Jersey |

Pages sent (including cover):  3

| RECIPIENT | FIRM | CC: | FAX NUMBER |
|---|---|---|---|
| Greg Crane Michael Taylor | Skyland Investments LLC | | (602) 532-7813 |
| Steven Laskero | Trinity Trust Investment Group | | (760) 294-6285 |

• Comments:

IRS CIRCULAR 230 DISCLOSURE : To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTE:
The documents accompanying this telecopy transmission contain information from the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named in the transmittal sheets. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopy is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone so that we can arrange for the return of the original documents to us at no cost to you.

3716017.1

Time Sent_____  Operator_____

12-15-2006  12:28    From-RIKER, DANZIG, SCHERER                          T-106  P.002  F-007



**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI**

ATTORNEYS  AT  LAW

**Michael R. O'Donnell**
Partner

<u>Direct:</u>
t: 973.451.8476
f: 973.451.8700
modonnell@riker.com
Reply to: Morristown

December 15, 2006

**VIA FACSIMILE: 602-532-7813 &**
**EMAIL (greg@crane.net)**
Greg Crane
Michael Taylor
Skyland Investments LLC

**VIA FACSIMILE (760-294-6285) &**
**EMAIL (s.laskero@cox.net)**
Steven Laskero
Trinity Trust Investment Group

Re:    Potential Assignment of Mortgage Between Sky Land Investments, LLC and
        TTIG, LLC and/or TTIG, LLC's Assignee on the "Property" Located at
        41-81 Clark Road, Bernardsville, New Jersey

Dear Messrs. Crane, Taylor and Laskero:

As you know, I represent Chicago Title Insurance Company as to an ongoing
investigation relating to title matters involving properties of Peter and Lorraine
Mocco and any liens and encumbrances put on those lands by certain First
Connecticut entities. In Mr. Crane's e-mail yesterday to Ms. Donna Sullivan of
Chicago Title Insurance Company ("Chicago Title"), he indicated that "Chicago
Title is simply to act as an [escrow] agent and to update the fully assignable
current policy to reflect the new named insured [TTIG, LLC]" regarding the
above-referenced assignment of mortgage. That title policy, however, cannot be
assigned to the proposed new named insured, TTIG, LLC, without TTIG, LLC
first being made expressly aware of the claims asserted by (i) EMP Whole Loan I,
LLC, namely that it holds a mortgage on the Property as set forth in its
November 29, 2006 letter (annexed hereto as Exhibit 1) and (ii) Lorraine and
Peter Mocco in the matter pending in the Superior Court of New Jersey
consolidated under <u>Titan Management L.P., et al. v. James J. Licata, et al.</u>, Docket
No. ESX-C-280-98, wherein the Moccos have filed a recent motion seeking to
add SWJ Holdings LLC ("SWJ") to the litigation and to divest James Licata.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, Suite 4920, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
www.riker.com

Gregg Crane
Michael Taylor
Steven Laskero
December 15, 2006
Page 2

Cynthia Licata, SWJ, and the First Connecticut entities of any interest in the Moccos' properties (the Moccos' Notice of Motion is annexed hereto as Exhibit 2). It is our understanding that the Moccos are contending that the First Connecticut entities were not the owners of the properties or proper lienholders. As a result of the Moccos' motion, the Court has issued an order (annexed hereto as Exhibit 3) permitting the Moccos' to seek leave to amend their Complaint to add parties and restraining the alienation, selling, transferring, and encumbering of various entities and properties, including the Property. To our knowledge, said motion for leave to amend has not been filed yet. Finally, both Skyland and TTIG should be aware of the recent decisions and orders of the United States Bankruptcy Court of the District of Vermont and the United States District Court of Vermont on the Moccos' motions to dismiss the First Connecticut bankruptcies (said Opinions annexed hereto as Exhibits 4 and 5). These Orders are part of the Licata Bankruptcy and are, accordingly, decisions or orders of the Court referred to in Exclusion Nine of Schedule B, Part I of the Title Policy.

You should also be aware that while EMP Whole Loan I, LLC is not reflected on the chain of title in the Mortgage, the Vermont Bankruptcy Court and District Court discuss EMP's role in the Mocco/First Connecticut transactions in their Opinions and you should be guided accordingly.

In light of the existing claims, any updating and assignment of the mortgage policy to TTIG, LLC and/or TTIG, LLC's Assignee will be subject to an additional endorsement adding to Schedule B, Part I the following item numbers: (11) the regularity of all terms, conditions, decisions, orders, etc. of the Superior Court of New Jersey in the matters consolidated under <u>Titan Management L.P., et al. v. James J. Licata, et al.</u>, Docket No. ESX-C-280-98; (12) the rights, claims, interests, etc. of EMP Whole Loan I, LLC as to an interest in the mortgage being assigned to TTIG, LLC and/or TTIG, LLC's Assignee or a preexisting mortgage; and (13) any claim by Lorraine Mocco, Peter Mocco or their related or affiliated entities that First Connecticut Consulting Group, Inc. ("First Connecticut"), James Licata or Cynthia Licata had no ownership interest in the Mortgage other than nominal interest and that any subsequent transfer of the Mortgage by First

TITLE
CLAIM

Gregg Crane
Michael Taylor
Steven Laskero
December 15, 2006
Page 3

Connecticut, James Licata, Cynthia Licata, or any subsequent holder of the
Mortgage should be deemed null and void and/or a fraudulent conveyance.

Very truly yours,

Michael R. O'Donnell

cc:        Sharon M. Buscher-Tuttle (via email buschertutles@ctt.com)
           Tammy Meruin (via email tammy.meruin@ctt.com)

3715860.2

# Exhibit 1

LAW OFFICES

## PELINO & LENTZ

A PENNSYLVANIA PROFESSIONAL CORPORATION

74 E. EUCLID AVENUE
SUITE 103
HADDONFIELD, NJ 08033-2336
856-428-9484
FAX 856-428-7833

November 29, 2006

Matthew E. Moloshok, Esquire
Hellring, Lindeman, Goldstein & Siegal, LLP
One Gateway Center
Newark, NJ 07102-5386

Re:   EMP Whole Loan I LLC Mortgage on 41 and 81 Clark Road,
      Bernardsville, New Jersey

Dear Mr. Moloshok:

In response to your question, please allow this letter to confirm that EMP Whole Loan I
LLC has not sold, assigned or otherwise transferred its interest in the mortgage on the above-
referenced properties.

Very truly yours,
PELINO & LENTZ,
a Pennsylvania Professional Corporation

By: _____
    Jay S. Ruder

JSR:sed
cc:   EMP Whole Loan I LLC

12-15-2006   12:28    From-RIKER, DANZIG, SCHERER                    T-106   P.007/067   F-007

# Exhibit 2

SCARPONE STAIANO LLC
By: James A. Scarpone, Esq.
744 Broad Street, Suite 1901
Newark, New Jersey 07102
(973) 648-0065
Attorneys for Peter Mocco and Lorraine Mocco and The Mocco Parties

| | |
|---|---|
| TITAN MANAGEMENT, L.P., et al., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: ESSEX COUNTY |
|        Plaintiffs, | Docket No.  ESX-C-280-98 |
| v. | *Civil Action (Action No. 1)* |
| JAMES J. LICATA, et al., | Before: Hon. Kenneth S. Levy, J.S.C. |
|        Defendants. | |

| | |
|---|---|
| PETER MOCCO, et al., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:   ESSEX COUNTY |
|        Plaintiffs, | Former Dkt. No.  ESX-L-4058-99 |
| v. | *Chancery Dkt. No.  ESX-C-397-99* |
| JAMES J. LICATA, et al., | Civil Action (Action No. 2) |
|        Defendants. | |

| | |
|---|---|
| EMP WHOLE LOAN I, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: HUDSON COUNTY |
|        Plaintiff, | Former Dkt. No.  HUD-F-13779-99 |
| v. | *Chancery Dkt. No.  ESX-C-396-99* |
| VILLAGE TOWNHOUSES ESTATES, INC., et al., | Civil Action (Action No. 3) |
|        Defendants. | This paper relates to all Actions. |

Captions continue on next page

**NOTICE OF MOTION**

| | |
|---|---|
| TITAN MANAGEMENT, L.P.,<br><br>           Plaintiff,<br>    v.<br><br>FIRST CONNECTICUT HOLDING GROUP,<br>LLC XXVI, et al.<br><br>           Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MORRIS COUNTY<br><br>Docket No.   MRS-L-2442-99<br>Chancery Dkt. No.  ESX-C-399-99<br><br>Civil Action (Action No. 4). |
| EMP WHOLE LOAN I,<br><br>           Plaintiff,<br>    v.<br><br>LORRAINE MOCCO, et al.,<br><br>           Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: SOMERSET<br>COUNTY<br><br>Docket No.  F-17349-99<br>Chancery Dkt. No.  ESX-C-6-00<br><br>Civil Action (Action No. 5) |

RETURN DATE: To be set by the Court
pursuant to R.:1:6-2(b)

TO:   Mr. James Licata
       23 Meeting House Road
       Greenwich, CT  06831

       also: 68 Sinawoy Road
       Cos Cob, CT  06802-2327

       Cynthia Licata
       23 Meeting House Road
       Greenwich, CT  06831

       also: 68 Sinawoy Road
       Cos Cob, CT  06802-2327

                 SWI Holdings LLC
                 c/o Proskauer Rose LLP
                 1585 Broadway
                 New York, NY  10036
                 Attn: Dale Schreiber, Esq.

                 also: 219 East 69th Street
                 New York, NY  10021
                 Attn: Stephen Podell

                 Robert J. Percy, Esq.
                 41 Hebron Avenue
                 Glastonbury, CT  06033
                 (Criminal Counsel to James Licata)

2

Heidi J. Sorvino, Esq.                          Daniel Shepro, Esq.
Arent Fox                                        Shepro & Blake
1675 Broadway                                    2051 Main St.
New York, NY  10019-5820                         Stratford, CT 06615
(Bankruptcy Counsel to James Licata)             (Counsel to Cynthia Licata)

PLEASE TAKE NOTICE that, the undersigned attorneys for the Mosco Parties, shall move before the Honorable Paul J. Vichness, J.S.C., at the Superior Court of New Jersey, Chancery Division, Wilentz Justice Complex, 212 Washington Street, Newark, New Jersey, at such time and date as the Court shall set for an Order as follows:

1.    Directing that SWJ Holdings LLC be added to these consolidated cases as an additional Defendant/Counterclaimant in Mosco, et al. v. Licata, et al., Action No. 2 of these five consolidated cases, as successor-in-interest to the rights, claims and interests (if any) of James Licata and Cynthia Licata or their affiliates.

2.    Directing SWJ Holdings LLC and James and Cynthia Licata to execute and record such corrective deeds and other instruments affecting title to the properties that are the subject of this litigation, as the Court's Special Fiscal Agent shall find necessary and appropriate to restore the records of title of all the subject properties to the condition that existed as of March 12, 2006, the date immediately preceding the first of the known recent recordings by SWJ, et al, and further providing that failure by SWJ to comply with paragraph 1 of this Order within 10 days of notice from the Special Fiscal Agent of his approval of the form and necessity of filing any corrective deed or other documents, shall automatically act as this Court's authorization and appointment of the Special Fiscal Agent as "Attorney-in-Fact for SWJ Holdings, LLC and James and Cynthia Licata Pursuant to Order of the Superior Court of New Jersey" for the purpose of

3

filing such corrective deed or other document.

      3.    Imposing sanctions upon SWJ, James J. Licata and Cynthia Licata for their willful violations of this Court's September 21, 2001 Order (¶ 5) and for their willful attempts to circumvent and undermine this Court's Orders of April 29, 2002 and September 24, 2001.

      4.    Granting final judgment against SWJ, James Licata and Cynthia Licata and all other parties in Action No. 2 declaring that Lorraine Mocco is the sole owner of 100% of the membership interests in the entity known as First Connecticut Holding Group LLC IV.

      5.    Granting final judgment against SWJ, James Licata and Cynthia Licata and all other parties in Action No. 2 declaring that Peter Mocco is the sole owner of 100% of the membership interests in the entity known as Liberty Harbor Holdings LLC and that Lorraine Mocco is the sole owner of 100% of the membership interests in the entity known as The Atrium at Hamilton Park Urban Renewal Associates LLC.

      6.    Converting This Court's "Order Dismissing the Licata Parties' Claims To, and Discharging Their Lis Pendens Filed Against, 'Fulton's Landing'," dated April 29, 2002, to a final judgment entered with prejudice to any future claims against that property, the entity which owns it, or the Mocco Parties whether such claims be asserted by the Licatas or anyone whose claim or interest arises from or through the Licatas.

      7.    Directing the Special Fiscal Agent to return all documents entrusted to him pursuant to this Court's September 21, 2001 Order, to the Moccos and terminating all limitations or restrictions on the Moccos' authority and rights to deal with the entities known as First Connecticut Holding Group LLC II, III, IV, X, XI and XIII.

4

Pursuant to Rule 1:6-2(b) of the Rules Governing the Courts of the State of New Jersey, the Court shall determine the mode and scheduling of the disposition of this motion.

PLEASE TAKE FURTHER NOTICE that in support of its motion, the Mocco Parties shall rely upon the Certification of James A. Scarpone dated September 21, 2006 and the Certification of Peter Mocco dated September 21, 2006, and the Memorandum of Law in Support of the Moccos' Motion to Enforce Litigants' Rights etc., all of which are being served with this motion.

SCARPONE STAIANO LLC
Attorneys for The Mocco Parties

By: _____
James A. Scarpone

Dated:   October 12, 2006

5

## CERTIFICATION OF SERVICE

I, JAMES A. SCARPONE, of full age, certify as follows:

1.    I am an attorney-at-law of the State of New Jersey and a member of the law firm of Scarpone Staiano LLC. In that capacity, I am familiar with the facts of this case.

2.    An original and one copy of the within Notice of Motion, Certification of James A. Scarpone dated September 21, 2006 and Certification of Peter Mocco dated September 21, 2006, in Support of the within Motion, were on this date forwarded via Hand Delivery to the Clerk of the Superior Court, Essex County Courthouse, Chancery Division, Wilentz Justice Complex, 212 Washington Street, Newark, New Jersey 07102, with a copy to the Hon. Paul J. Vichness, J.S.C.

3.    On the same day, I served the above papers on the following parties by Federal Express at the following address:

Mr. James Licata
25 Meeting House Road
Greenwich, CT  06831

also:    68 Sinawoy Road
Cos Cob, CT  06802-2327

Cynthia Licata
25 Meeting House Road
Greenwich, CT  06831

also:    68 Sinawoy Road
Cos Cob, CT  06802-2327

Daniel Shepro, Esq.
Shepro & Blake
2051 Main St.
Stratford, CT 06615
(Counsel to Cynthia Licata)

SWJ Holdings LLC
c/o Proskauer Rose LLP
1585 Broadway
New York, NY  10036
Attn: Dale Schreiber, Esq.

also:    219 East 69th Street
New York, NY  10021
Attn: Stephen Podall

Robert J. Percy, Esq.
41 Hebron Avenue
Glastonbury, CT  06033
(Criminal Counsel to James Licata)

Heidi J. Sorvino, Esq.
Arent Fox
1675 Broadway
New York, NY  10019-5820
(Bankruptcy Counsel to James Licata)

6

4.     I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


By:  _James A. Scarpone_____
     James A. Scarpone

Dated:   October 12, 2006

7

# Exhibit 3

12-15-2006  12:31   From-RIKER, DANZIG, SCHERER                T-106  P.016/067  F-007



SCARPONE STAIANO LLC
By: James A. Scarpone, Esq.
744 Broad Street, Suite 1901
Newark, New Jersey 07102
(973) 648-0065
Attorneys for Peter Mocco and Lorraine Mocco and The Mocco Parties

| | |
|---|---|
| TITAN MANAGEMENT, L.P., et al., | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: ESSEX COUNTY |
| Plaintiffs, | Docket No. ESX-C-280-98 |
| v. | Civil Action (Action No. 1) |
| JAMES J. LICATA, et al., | Before: Hon. Paul J. Vichness, J.S.C. |
| Defendants. | |
| PETER MOCCO, et al., | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY |
| Plaintiffs, | Former Dkt. No. ESX-L-4058-99<br>Chancery Dkt. No. ESX-C-397-99 |
| v. | |
| JAMES J. LICATA, et al., | Civil Action (Action No. 2) |
| Defendants. | |
| EMF WHOLE LOAN I, | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: HUDSON<br>COUNTY |
| Plaintiff, | |
| v. | Former Dkt. No. HUD-F-13779-99<br>Chancery Dkt. No. ESX-C-396-99 |
| VILLAGE TOWNHOUSES ESTATES,<br>INC., et al. | Civil Action (Action No. 3) |
| Defendants. | This paper relates to all Actions. |

Captions continue on next page.

ORDER DATED NOVEMBER 27, 2006

| | |
|---|---|
| ————————————— x<br>TITAN MANAGEMENT, L.P.,<br><br>Plaintiff,<br>v.<br><br>FIRST CONNECTICUT HOLDING GROUP,<br>LLC XXVI, et al.<br><br>Defendants.<br>————————————— x | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MORRIS COUNTY<br><br>Docket No.  MRS-L-2442-99<br>Chancery Dkt. No.  ESX-C-399-99<br><br>Civil Action (Action No. 4) |
| EMP WHOLE LOAN I,<br><br>Plaintiff,<br>v.<br><br>LORRAINE MOCCO, et al.,<br><br>Defendants.<br>————————————— x | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: SOMERSET<br>COUNTY<br><br>Docket No.  F-17349-99<br>Chancery Dkt. No.  ESX-C-6-00<br><br>Civil Action (Action No. 5) |

This matter came before the Court upon the Motion of Peter and Lorraine Mocco and their affiliated entities for an Order ~~enforcing this Court's September 21, 2001 Order~~ *ALLOWING THEM TO FILE AN AMENDED COMPLAINT* and for certain related relief. The Moccos were represented by Scarpone Staiano LLC (James A. Scarpone, Esq. appearing) and Heilring Lindeman Goldstein & Siegal LLP (Matthew E. Moloshok, Esq. appearing). Opposing papers were filed on behalf of Cynthia Licata by Weiner Lesniak LLP (Ronald A. Berutti, Esq. appearing). Wilentz Goldman & Spitzer P.A. (Willard C. Shih appearing) appeared on behalf of SWJ Holdings LLC but filed no papers. Also appearing on the record were: Joel R. Gluckman, Esq. of Scarinci & Hollenbeck, LLC on behalf of the Jersey City Redevelopment Association and Christopher P. Massaro, Esq. of Cole, Schotz,

2

Meisel, Forman & Leonard, P.A. on behalf of Read Properties Group, LLC. For the reasons

stated on the record by this Court it is hereby ordered as follows:

IN ORDER TO PRESERVE THE STATUS QUO

1.    Pending further Order of this Court, James Licata, Cynthia Licata, SWI    *As to Licata, Lorraine 19 P-G*

Holdings, LLC, their affiliated entities and their respective agents, servants, and attorneys are

hereby restrained from alienating, selling, transferring or encumbering any interests in LLCs or

properties which are the subject of any of these consolidated cases, including, but not limited to,

the following LLCs and properties:

  a.    First Connecticut Holding Group, LLC IV and any real estate
        owned by this entity;

  b.    Liberty Harbor Holding, LLC and any real estate owned by this
        entity;

  c.    Fulton's Landing Urban Renewal Company, LLC and any real
        estate owned by this entity;

  d.    The Atrium at Hamilton Park Urban Renewal Associates, LLC and
        any real estate owned by this entity;

  e.    41 and 81 Clark Road
        Bernardsville, New Jersey

  f.    Any real estate interests owned by First Connecticut
        Holding Group, LLC XIII.

*NOTHING CONTAINED IN THIS PARAGRAPH SHALL PREVENT ANY OF THE PARTIES FROM REQUESTING PERMISSION THE COURT TO ALIENATE, SELL, TRANSFER, OR ENCUMBER THE SUBJECT [illegible] MOTION FOR PERMISSION TO FILE PARTIES SHOWS THE RED ANDRE*

2.    The Mocces shall promptly serve and file an amendment to the Complaint

in Action No. 2 (Chancery Docket No. ESX-397-99) adding such additional parties and claims as

are necessary and essential to a resolution of the ownership issues with respect to the properties

identified in paragraph 1 above. *SAID MOTION SHALL INCLUDE A COPY OF THE PROPOSED AMENDED COMPLAINT*

3

3.    In all other respects, the Mocco Motion is denied without prejudice, and

may  be renewed after filing and service of the amended complaint described in paragraph 2

above. ALL CLAIMS AND DEFENSES OF ALL PARTIES ARE PRESERVED.

HON. PAUL J. VICHNESS, J.S.C.

4

# Exhibit 4

12-15-2006  12:32  From-RIKER, DANZIG, SCHERER                    T-106  P.021/067  F-007

*Formatted for Electronic Distribution*                              *Not For Publication*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF VERMONT

In re:

FIRST CONNECTICUT CONSULTING
GROUP, INC., *et al.*,                                    Chapter 11 Case
              Debtors-in-Possession.                     Misc. Proceeding # 04-101

Appearances:

<table>
<tr><td>

*James Scarpone, Esq.*<br>
*Scarpone, Staiano & Savage, LLC*<br>
*Newark, NJ*<br>
*and*<br>
*Irve J. Goldman, Esq.*<br>
*Pullman & Comley, LLC*<br>
*Bridgeport, CT*<br>
*For the Movants*

</td><td>

*Ronald L. Castle, Esq.*<br>
*Lisa A. Estrada, Esq.*<br>
*Arent Fox Kintner Plokin &*<br>
*Kahn PLLC*<br>
*Washington, DC*<br>
*For the Debtors-in-Possession*<br>
<br>
*Alan J. Brody, Esq.*<br>
*Scott J. Good, Esq.*<br>
*Buchanan Ingersoll PC*<br>
*Princeton, NJ*<br>
*and*<br>
*James R. Byrnes, Esq.*<br>
*Tyler, Cooper & Alcorn, LLP*<br>
*Hartford, CT*<br>
*For the Official Committees*<br>
*of Unsecured Creditors*

</td></tr>
</table>

### MEMORANDUM OF DECISION
#### GRANTING MOTION TO DISMISS

Peter and Lorraine Mocco have filed a Motion to Dismiss the chapter 11 cases of First Connecticut Holding Group LLCs II, III, X, XI and XIII (collectively, "the LLCs"), asserting that they – not James Licata – owned these LLCs on the date of the bankruptcy filings, and therefore James Licata's filing of these cases is without legal effect.[1] Determining ownership is generally straightforward, but not so here. The relationship between the Moccos, James Licata, First Connecticut Consulting Group, Inc. ("First Connecticut")[2], and the LLCs, the various transactions that led to the creation and alleged transfers of ownership of the LLCs, and the

---

[1] While only Peter Mocco appeared in this Court, for convenience, Peter and Lorraine Mocco shall be referred to singularly as "Mocco," unless specifically noted otherwise.

[2] Licata is the principal of First Connecticut Consulting Group, Inc.

12-15-2006   12:32   From-RIKER, DANZIG, SCHERER                                  T-106   P.022/067   F-007

accusations of unsavory conduct on both sides, are tangled together in a complicated web. Once that web is finally disentangled, however, two essential strands of facts and law become evident as the undergirding for the whole web. The Motion to Dismiss is resolved by following these two strands to their logical, and legally compelled, conclusion. The first strand leads through facts relating to whether James Licata ("Licata") owned the subject LLCs and, hence, had authority to file these chapter 11 petitions. The second strand starts with the assumption that Licata did have authority to file these cases, and weaves in and out of the factors relevant to whether the cases were filed in good faith. After careful scrutiny of each fiber of the web, and navigation of the many loops and knots woven by the parties' conduct, this Court finds that Licata did not own the LLCs on the date of filing, and even if he did, that the petitions were not filed in good faith. Therefore, the Motion to Dismiss is granted.

This Court has jurisdiction to adjudicate this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). Although all of the chapter 11 cases and the Motion to Dismiss were filed in the United States Bankruptcy Court for the District of Connecticut, venue in this Court is proper by virtue of the Order for Change of Venue to the District of Vermont Pursuant to 28 U.S.C. § 1412, entered in January 2004.

## I. DISCUSSION:
### "OH, WHAT A TANGLED WEB WE WEAVE,
### WHEN FIRST WE PRACTICE TO DECEIVE!"[3]

We all learned as children that it is indeed a tangled web we weave when first we practice to deceive. The illusion to a web is particularly apt in this case where each of the parties often acted in ways that can only be described as deceptive, with each party attempting to protect himself from suffering a loss and to keep the other party from knowing all the facts. The Court is asked to untangle the various strands of the web that Licata and Mocco have woven through a complex series of transactions. Some of the strands of this web are connected to the creation of legally sound LLCs as part of a legitimate financing vehicle. Some strands emanate from steps taken by Mocco because of his anxiety about whether Licata would keep his word. Some strands of the web spin out from Licata's desire to make substantial fees as both Mocco's financial consultant and his lender. And, finally, some strands flow from the skirmishes going on in each of the party's chapter 11 cases. It was clear from the testimony that these strands have become so entangled that even the parties have a hard time separating and making sense of them. Thus, before getting to the two key issues – ownership and good faith – the Court must make some findings about the nature of the legal relationship between the parties and the obligations imposed on Mocco and Licata under the three contracts between them.

---

[3] Sir Walter Scott, *Marmion*, VI, intro., st. 17, *in* BARTLETT'S FAMILIAR QUOTATIONS 396:23 (Justin Kaplan gen. ed., 17th ed. 2002).

The Court conducted an eight-day trial in February 2004 on Moccos' Motion to Dismiss, hearing testimony from eight witnesses and admitting over 85 exhibits. In addition to Licata and Mocco, the Court heard testimony from: (1) Pieter de Jong, Esq., an attorney who originally represented Licata, but who later was working for Mocco as well, and whom the Court finds generally credible; (2) Donald Wuertz, C.P.A., one of Mocco's employees whom the Court finds very credible; (3) Brian Opert, a former First Connecticut employee who brought property management expertise to Licata's organization and whom the Court finds very credible; (4) Lawrence Goldberg, C.P.A., who did tax work for First Connecticut from 1995 to 2000 and whom the Court finds generally credible; (5) Lawrence Lipson, Esq., an attorney with Proskauer Rose who represented Licata and First Connecticut and whom the Court finds credible – although he had little recall about the pertinent transactions between Licata and Mocco; and (6) Jeffrey Levitan, Esq., an attorney with the Proskauer Rose law firm who also represented First Connecticut regarding the transactions between First Connecticut and Mocco and whose recollection is tenuous as to the subject transactions, but whom the Court finds credible.[4]  The Court finds that Peter Mocco was a more credible witness than Licata on all issues.

### A. The Legal Relationship Between Licata and Mocco and the Three Contracts Between Them

It was in May of 1996, when Mocco owned all the properties that were later placed in the LLCs, that Mocco met Licata and the events were put into motion that led to the instant controversy. At that time, Mocco had been in a chapter 11 reorganization case for approximately two years. He was desperately trying to have a plan of reorganization confirmed.  However, one of Mocco's major secured creditors, First Union Bank ("First Union"), opposed his proposed Fourth Amended Plan of Reorganization (hereinafter, "the Plan") and in fact, had taken the rather unusual step of filing a competing plan.  Mocco determined that the only way for him to get his Plan confirmed was to buy out First Union's claim.[5]

Mocco had previously reached an agreement with First Union as to a discounted buyout figure of the First Union claim, but the deal never closed because Mocco was not able to obtain financing to meet the immediate closing date upon which First Union insisted.  Mocco's inability to secure immediate financing

---

[4]  The Court finds that the testimony of Attorneys Lipson and Levitan, while credible, shed little light on the core issues, namely ownership of the LLCs (and, in turn, authority to file the present cases) and good faith. Likewise, the Court finds the widespread testimony about pre-September 26, 1996 meetings with the various attorneys obfuscates these issues. Thus, finding said testimony superfluous to the main issues that need to be determined here, the Court will not address it.

[5]  The amount due First Union at this time was approximately $44 million.

brought the negotiations between Mocco and First Union to an abrupt conclusion.[6]  Thus, Mocco found himself in a position where the only way he could extricate First Union from the bankruptcy reorganization process and obtain confirmation of his Plan was through a two-step financing arrangement, using a bridge loan to obtain the immediate relief he needed, with permanent financing to follow.  In the spring of 1996, Mocco sought funding sources for a bridge loan.  This is how and why he made the acquaintance of James Licata in May 1996.

### (I) The First Contract Between the Parties: The Consulting Agreement

Mocco met Licata through a third party.  Licata represented himself as a workout specialist who had extensive experience providing financially distressed parties with what he termed "hard money."  After their initial meeting, Mocco executed a consulting agreement with Licata and his company, First Connecticut, under which Mocco agreed to pay First Connecticut a $200,000 consulting fee.  See Ex. —12.  Importantly, under the terms of the consulting agreement, Licata was acting as Mocco's agent and First Connecticut was to find and secure a bridge loan for Mocco using the Hamilton Park Health Care Center property ("Hamilton Park") as collateral for the loan.  It is critical to what later transpired that under the terms of the consulting agreement Mocco would retain ownership of the Hamilton Park property in this transaction.  See id.

From his discussion with First Union, Licata learned, first, that First Union required $22 million in immediate cash to satisfy its $44 million claim and, second, that First Union did not want to deal with Mocco.  Based upon these discussions, concluding that this deal could be consummated, and perceiving Mocco to be in desperate straits, First Connecticut agreed to lend Mocco short-term money to purchase First Union's claim.  According to Licata, he told Mocco that First Connecticut had its own funds that it could lend Mocco, but not enough to cover the full $22 million.  However, the evidence demonstrated that what First Connecticut actually had was a $16 million line of credit with EMP Whole Loan I ("EMP") which Licata planned to draw upon in order to make the loan.[7]  Mocco would have to raise the difference, about $6 million, plus pay all closing expenses.  Mocco soon discerned that he would have to pledge other properties he owned to generate the $6 million he needed to acquire the First Union claim.  Mocco pledged his personal residence, the property known as A-1 Storage, a town house development, a condo complex and raw land in Sayerville, New Jersey,

---

[6]  Mocco had defaulted on his First Union obligations and when he could not refinance those obligations in the short time frame demanded by First Union, First Union initiated foreclosure proceedings and had Mocco's bank accounts frozen.  These actions were the impetus for Mocco filing for Chapter 11 bankruptcy protection.

[7]  During his examination, Licata testified that he had a line of credit with EMP, see, e.g., Tr. 2/4/04 p.m. at p. 158 (Licata); however, there is no documentary evidence that the acquisition loan went to him personally.  Moreover, there was testamentary evidence that the acquisition loan was made to First Connecticut.  Thus, the Court finds that EMP made the acquisition loan to First Connecticut.

as well as other parcels in order to get this cash. What Mocco did not know was that, in its role as lender, First Connecticut would charge Mocco significant loan fees in addition to the consulting fees. However, it appeared that Mocco would be able to raise the necessary $6-plus million (that ultimately totaled $10.6 million, see Opert testimony, Tr. 2/19/04 at pp. 48-50), that the deal would go forward, and that First Union would finally be out of Mocco's bankruptcy case.

They hit the first bump in the road when EMP placed restrictions on First Connecticut's use of the $16 million, namely, that EMP would not advance this money to First Connecticut if that company was going to loan it to a debtor. EMP required that any loan of these funds be made to a bankruptcy-remote entity.[8] According to Licata, EMP instructed First Connecticut to: (1) set up limited liability companies ("LLCs") and transfer ownership of Mocco's properties into the LLCs to circumvent this restriction; and (2) to name Licata and his wife, Cynthia, as the owners of the LLCs, to ensure that the LLCs would be true "bankruptcy-remote entities."

#### (ii) The Second Contract Between the Parties: The 3-page Agreement

Mocco did not want to transfer ownership of his properties into the LLCs, but he was desperate to have First Union's claim bought out so that he could have his Plan confirmed and he could get on with his life. Knowing the precarious situation Mocco was in, the "EMP boys" (as Licata calls them) made their squeeze-play; they informed Licata that Mocco had to put up an additional $5 million for EMP to use for its various investment projects as a condition of EMP making the loan to First Connecticut. Having run out of options, Mocco resignedly agreed to "invest" the $5 million in EMP. However, Mocco was nervous about the many new requirements and changes in the terms of the financing and adamantly wanted to make clear that ownership of the properties being placed in the LLCs would revert to Mocco once the bridge loan was refinanced and replaced with long-term debt. To address these concerns, Mocco drafted an agreement between himself and Licata, specifying that Licata was taking title to the properties as a nominee only. Although he is an attorney, Mocco did not create a legally sophisticated or complex document. The agreement was in plain English and only three pages long.[9] The first two pages describe Licata's responsibilities and the third page describes Mocco's responsibilities. Significantly, Licata signed the 3-page agreement at the bottom of the second page. Conversely, although he drafted it and insisted that Licata sign it, Mocco never signed the 3-page agreement. While it is not dated, both Licata and Mocco testified that Mocco presented it and

---

[8] During the course of the trial, it was revealed that this requirement actually originated from EMP's lender, CS First Boston, which had a policy prohibiting loans to a party who was either in bankruptcy or had previously filed bankruptcy.

[9] Hence, this agreement is referred to by the parties and herein as "the 3-page agreement".

Licata signed it on or about September 25, 1996. The timing is important as this was the same day the properties were transferred into the LLCs, and just one day before the acquisition financing closed and the final hearing was held confirming Mocco's Plan. Of particular significance, the agreement made clear that: (1) First Connecticut was acting as Hamilton Park's nominee and consultant;[10] (2) the properties transferred to First Connecticut would be reconveyed to Mocco for $1 when the acquisition financing was replaced with permanent financing; and (3) if and when the property would be transferred back to Mocco was within Mocco's sole discretion. Several witnesses confirmed that the 3-page agreement was intended specifically to accomplish these three objectives. See, e.g., Tr. 2/10/04 at pp. 121-22 (Mocco); Tr. 2/2/04 a.m. at p. 29 (de Jong); Tr. 2/19/04 at pp. 32-33 (Opert). In stark contrast, however, Licata testified that he believed the 3-page agreement was "a non-binding gentlemen's agreement." Cf., Tr. 2/4/04 p.m. at pp. 163-64 (Licata); Tr. 2/9/04 p.m. at pp. 187-89 (Licata). The Court finds Licata's testimony on this point to be both disturbing and disingenuous.

The dispute over the import of the 3-page agreement revolves, to a large extent, on the meaning of the term "nominee" and whether Licata was holding title to Mocco's properties in a purely nominee capacity. According to Black' Law Dictionary, a nominee is "[o]ne designated to act for another in his or her place." BLACK'S LAW DICTIONARY 1070 (6th ed. 1990). As one court has described it, a nominee is like a dummy, *holding mere title to the property without any beneficial interest; it is an arrangement of convenience.* See National Bond & Share Corp. v. Hoey, 14 F. Supp. 787, 788 (S.D.N.Y. 1936). A court should consider six factors when determining whether property is held by a nominee:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continued to enjoy the benefits of the transferred property.

LiButti v. United States, 968 F. Supp. 71, 76 (N.D.N.Y. 1997),[11] aff'd in part and rev'd in part on other grounds, 178 F.3d 114 (2d Cir. 1999). For purposes of the instant dispute, it is particularly relevant that this

---

[10] As between the parties, Mocco consistently acted on behalf of Hamilton Park, signing all relevant documentation for Hamilton Park.

[11] Having found in a proceeding below that New Jersey's substantive law applied, the district court instructed in this case that it found no reported New Jersey cases addressing the factors relevant to the nominee theory. See LiButti, 968 F. Supp. at 75. Therefore, it would apply factors used by other courts that have considered the nominee theory. See id.; Towe Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1454 (D. Mont. 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993); Hill v. United States, 844 F. Supp. 263, 271 (W.D.N.C. 1993)).

list of factors does not include a requirement that appointment of a nominee must be evidenced by a writing.[12] Thus, even if the Court were to find that the validity of the 3-page agreement was in question because Mocco did not sign it, the analysis of whether Licata was holding the property as a nominee would not depend on resolution of that question.

Applying this six-prong test to the present facts, the Court finds that Licata did hold title to these properties as a nominee. First, Licata did not pay for the properties transferred into the LLCs and the testimony demonstrated that he never contributed his own funds for the maintenance or debt service of these properties. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert). Second, the properties were placed in the LLCs and the ownership of those LLCs was placed in Licata' name in anticipation of receiving approval of Mocco's Chapter 11 Plan, i.e., to avoid continued litigation over the confirmation of Mocco's Plan. Third, while not having a close relationship in a familial sense, Licata and Mocco had a tight business relationship, as evidenced by the facts that Mocco had hired Licata as his consultant, had agreed to enter joint ventures with him and had advanced funds for those joint ventures. See, e.g., Tr. 2/19/04 at pp. 62-63 (Opert). Fourth, while the conveyance of the properties to the LLCs were recorded, the properties were never titled in Licata's name and the 3-page agreement plainly stated that the purpose of placing the properties in the LLCs was administrative ease. Fifth, the evidence unequivocally demonstrated that Mocco retained "possession" of the properties. No keys to the properties were ever given to Licata or any of his employees, Mocco continued running and managing all the properties, and Mocco paid all expenses associated with the properties. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert). Sixth, to the extent applicable, Mocco did continue to "enjoy" the benefits of the properties. Mocco continued to live in his personal residence; he also continued to operate the commercial and investment properties and used a substantial portion of one of the properties for his business headquarters. Thus, the Court finds the facts presented satisfy all six factors set forth in LiButti, and concludes that Licata was Mocco's nominee and held title to the properties in a nominee capacity only. This conclusion is consistent with the 3-page agreement, but is not dependent upon that agreement being enforceable.

Though not essential to its conclusion, the Court does find the 3-page agreement to be valid and enforceable. Licata's argument that the 3-page agreement is not enforceable because Mocco did not sign it is unconvincing. Mocco's conduct emphatically demonstrates his commitment to the terms of the agreement and constitutes promissory estoppel as to Licata's argument that the agreement is not binding. As required

---

[12] Licata argues that under the terms of the consulting agreement between himself and Mocco, he was Mocco's "sole and exclusive agent" for 120 days and since that 120-day exclusivity period expired before the September 26, 1996 confirmation hearing he cannot be found to be Mocco's nominee. However, since the Court finds no writing is required to appoint a nominee, it finds this argument unpersuasive.

by the agreement, Mocco: (1) repaid the acquisition loans obtained by First Connecticut from EMP, see, e.g., Tr. 2/10/04 at p. 124 (Mocco); (2) contributed over $10 million to First Connecticut towards the $22 million needed to buy out First Union's claim, see, e.g., Tr. 2/19/04 at pp. 62-63 (Opert); (3) placed long-term triple-net leases on the Hamilton Park and A-1 properties to secure the maximum refinancing possible on those two properties and used the refinancing proceeds to pay off the acquisition debt, see, e.g., Tr. 2/19/04 at pp. 113-14 (Goldberg); (4) made an additional $5 million available to First Connecticut for joint ventures undertaken by himself and First Connecticut, see, e.g., Tr. 2/9/04 p.m. at 56 (Mocco); and (5) agreed to make First Connecticut whole if it incurred additional tax obligations over and above its own tax obligations as a result of the contemplated property transfers, see, e.g., Tr. 2/10/04 p.m. at p. 46 (Mocco). See Ex. — 6 at ¶2 (a-f). "Quasi-contractual liability such as promissory estoppel is based on the equitable principle that a person should not be allowed to unjustly enrich himself at the expense of another." Sentra v. Cendant Corp., 223 F. Supp.2d 563, 574 (D.N.J. 2002) (citing Rodichok v. Limitorque Corp., 1997 WL 392535 (D.N.J.1997)); see also Cwaklinsky v. Mobil Chemical Co., 364 F.3d 68 (2d Cir. 2004) (relying on state law to determine whether a cause of action lies under the theory of promissory estoppel). Thus, while Mocco does not seek recovery under promissory estoppel in this Court, the principle warrants the Court's finding that the 3-page agreement is binding on both Mocco and Licata the principle warrants the Court's finding that the 3-page agreement is binding on both Mocco and Licata[13].

### (iii)  The Third Contract Between the Parties: The Escrow Agreement

On September 25, 1996, Mocco's properties were transferred to the LLCs so the collateral could be held in the form required by EMP. Once the properties were in the bankruptcy-remote LLCs and the certificates of ownership for each LLC (that were issued to Licata and his wife) were pledged to EMP (together with unit powers), EMP loaned First Connecticut the money necessary for First Connecticut to buy out First Union's claim in Mocco's bankruptcy case. This was the backdrop which necessitated the creation of the third and final contract between Mocco and Licata.

In May 1997, Mocco and Licata entered into an Escrow Agreement, naming Pieter de Jong, Esq. as their Escrow Agent. See Ex. — 8. The stated purpose of the Escrow Agreement was to "provide for the orderly transition of title" to the properties held by the LLCs back to Mocco. See id. at 1. Under the Escrow Agreement, once EMP released its lien on the ownership interest in the LLC holding each parcel of real

---

[13] "Under New Jersey law, to recover on a theory of promissory estoppel, a plaintiff must allege and prove that (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promise would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) [the promisee] incurred a detriment in said reliance." Sentra v. Cendant Corp., 223 F. Supp.2d at 574 (citing Swider v. Ha-Lo Indus., 134 F. Supp.2d 607, 619 (D.N.J.2001); Peck v. Imedia Inc., 293 N.J. Super. 151, 165, 679 A.2d 745, 752 (App. Div.1996)).

property, EMP was to convey ownership of that parcel to the Escrow Agent; upon EMP's conveyance of the ownership shares to the Escrow Agent, the Escrow Agent was authorized to issue replacement shares to Mocco or his designee. See id. at ¶4. In conjunction with the execution of the Escrow Agreement, Licata (and his wife) granted de Jong a limited power of attorney "for the sole, exclusive and restricted purpose to enable the grantee [EMP] to endorse and surrender to the [LLC] for which it pertains, member/shareholder share certificates" issued to him. See id. at p.9. Licata also signed an Authorization Statement, dated June 2, 1997, instructing EMP to deliver the membership certificates to de Jong. See id. at p.11. At Mocco's request, Licata re-executed the 3-page agreement at the time the parties executed the Escrow Agreement. It is not clear why the parties executed the Escrow Agreement and re-executed the 3-page agreement at this time, but neither Licata nor Mocco deny that they did so, and the Court concludes that their reason for doing so is irrelevant.

Having examined the Escrow Agreement together with the record before it, the Court finds, contrary to Licata's claim, the conditions of the Escrow Agreement were met such that de Jong, in his capacity as the Escrow Agent, was required to issue documents of ownership to Mocco or his designee. EMP had released the "ownership shares" of the respective LLCs, the Licatas had executed and delivered irrevocable Limited Powers of Attorney to de Jong granting de Jong the authority to issue replacement shares to the person or entity Mocco would designate, and Mocco designated the person or entity to whom he wanted replacement shares issued. Thus, all conditions precedent had been satisfied and de Jong was bound by the Escrow Agreement to issue the replacement ownership shares.

### B. Ownership of the LLCs

#### (1) Documentary Evidence of Mocco's Ownership

Having described the relationship between the parties, the Court turns to the penultimate question of who owned these LLCs on the date these bankruptcy cases were filed. Establishing ownership of an LLC is more complicated than determining ownership of other entities because an LLC is a hybrid creature manifesting some attributes of a corporation and some attributes of a partnership. A limited liability company is a vehicle designed to give an individual or entity the protection from liability associated with a corporation, as well as the tax benefits of a partnership. See Kuhn v. Tumminelli, 366 N.J. Super. 431, 439, 2004 WL 239883, at *3 (N.J. Super. A.D. 2004) (citing to New Jersey State legislative history). As one commentator has observed, "The allure of the limited liability company is its unique ability to bring together in a single business organization the best features of all other business forms—properly structured, its owners obtain both a corporate-styled liability shield and the pass-through tax benefits of a partnership." See David M. Hastings, J.D., Annotation, Construction and Application of Limited Liability Company Acts, 79 A.L.R.5th 689, at § 2[a].

The LLCs that were created on September 12, 1996 were intended to be bankruptcy-remote entities that would hold title to Mocco's properties; they were established in New Jersey and, according to their respective operating agreements, were governed by the laws of the State of New Jersey. See, e.g., Ex. D-48. These operating agreements contained a requirement that the agreement of all members was required in order to effect the transfer of any member's interest. However, the operating agreements did not set forth the mechanics of transfer. Similarly, the agreements failed to spell out how ownership would be evidenced. Attorney de Jong ordered a limited liability kit for each LLC when he set up the LLCs; for each LLC there was a seal, a certificate book with 15 perforated share certificates (pre-numbered in sequential order), and a certificate ledger. Certificates were issued for each LLC and the initial issuance and transfer of certificates were recorded in the appropriate ledger. Additionally, to facilitate the acquisition financing necessary to buy out First Union's claim in Mocco's bankruptcy case, de Jong issued unit powers for each LLC that were given to EMP as security for its loan to First Connecticut.

Pursuant to the May 1997 Escrow Agreement, see Ex. —8 at ¶4, in June 1997, Licata granted a Limited Power of Attorney to Pieter J. de Jong, Esq. "for the sole, exclusive and restricted purpose to enable the grantee [de Jong] to endorse and surrender to the Entity for which it pertains, member/shareholder share certificates issued in my name" for each of the LLCs. See id. He also executed an "Authorization Statement" pursuant to the Escrow Agreement, see, id. at ¶3, which was sent to EMP and which authorized EMP to deliver "all ownership shares of the entities owning the Properties upon the release of the same by EMP . . ." This issuance and transfer of certificates were documented in the ledgers. However, although all of the certificates were prepared, not all of them were signed. There is no evidence other than the ledgers and share certificates regarding the ownership of the LLCs; that is, none of the LLCs have minutes of member meetings or resolutions adopted by the members or amendments of the operating agreements in their respective records.

According to the New Jersey Limited Liability Act, where an operating agreement does not address an issue, the Act serves as the default authority on that issue. See Kuhn, 366 N.J. Super. at 431, 2004 WL 239883, at *4. Unfortunately, the New Jersey LLC Act provides little instruction on the issue of how to effect transfer of LLC ownership interests either. When, as here, neither the subject LLC documents nor the LLC Act address the salient issue, it is appropriate for this Court to look to, and analogize from, case law addressing the issue in the context of corporate or partnership entities.

> [W]hen a court is interpreting an LLC act or agreement, the court will focus on
> the particular aspect of the LLC that gives rise to the problem, with emphasis
> on the foundational business form from which that characteristic originated.
> Usually, the particular aspect can be traced to either the corporate components
> or the partnership components of the LLC act or agreement.  In such cases
> where the characteristics originated from the partnership aspects of the LLC,
> the court will use the established principals [sic] and precedent of the

partnership law to resolve the issue. In such cases where the characteristic originated from the corporate aspects of the LLC, the court will utilize the established principals [sic] and precedent of corporate law to resolve the issue.

David M. Hastings, J.D., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689, at § 2[a].

Based on the evidence before it, the Court finds that the certificate ledgers for each LLC were the controlling documents demonstrating the transfer of interest in the LLCs and demonstrating the ultimate ownership of interests in the LLCs. The Court finds that LLCs mirror corporations as to evidence of ownership. Thus, it relies on cases interpreting ownership in corporations to analyze this question. More specifically, the Court finds that in this instance the LLCs before it are most similar to closely-held corporations. Therefore, the Court gives jurisprudence of closely-held corporations the most weight on this issue.

Under New Jersey case law regarding closely-held corporations, the courts have held that it is not necessary for a stock certificate to be issued to a stockholder to establish ownership rights, "the certificate being merely the evidence or muniment of title, and not the property itself." Piechowski v. Matarese, 54 N.J. Super. 333, 343 (1959) (citations omitted); see also Crouse v. Argorganic, Inc., No. A-5877-01T5, slip op. at 10 (N.J. Super. Sept. 30, 2003) (ownership in a close corporation need not be evidenced by a stock certificate); Abraham v. Township of Teaneck Ethics Bd., 349 N.J. Super. 374, 380 (2002) (instructing that physical possession of stock certificates is not a prerequisite to ownership in a company). "In the absence of an express provision to the contrary, stock may be transferred by delivery of a separate written transfer, without the delivery of any certificate, especially where no certificate has ever been issued, or where it is not in possession of the transferor." Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 163 (1984) (citations omitted). Hence, in reliance upon New Jersey case law involving closely-held corporations, the Court finds that Licata's failure to transfer a certificate to Mocco does not vitiate Mocco's ownership. The Court further finds that per the certificate ledger, Mocco was the record owner of the LLCs and thus owned the properties held by those LLCs, as of September 1, 2001.

### (ii) Conduct by Mocco Demonstrating His Ownership

Four crucial events between the parties transpired on or around September 26, 1996. First, the LLCs were created and the Mocco properties were transferred to the LLCs to provide the collateral for the First Connecticut acquisition loan. Second, EMP loaned First Connecticut $16 million toward the purchase of the First Union claim. Third, First Connecticut used the loan proceeds from EMP and $6 million from Mocco to purchase the First Union claim. Fourth, and just hours after First Connecticut bought First Union's claim

against Mocco, the Mocco chapter 11 Plan was confirmed – thanks to First Connecticut's vote (in place of First Union's) in favor of Mocco's Plan.

At all times subsequent to these four transactions, Mocco provided the monies necessary to service the EMP acquisition loan. See, e.g., Tr. 2/10/04 p.m. at pp. 84-91 (Mocco); Tr. 2/19/04 at pp. 42-43 (Opert). Because of the rather awkward nature of the loan transaction and the fact that the owner of the collateral was not the obligor on the loans, an elaborate payment relay procedure was created. On a monthly basis, First Connecticut contacted Mocco to provide him with that month's EMP invoice amount, Mocco wired the funds to First Connecticut, and First Connecticut would then forward the payment to EMP. Mocco never missed a payment. See, e.g., Tr. 2/10/04 p.m. at pp. 84-91 (Mocco). Moreover, while First Connecticut facilitated the monthly payments from Mocco to EMP, the record is unequivocal that no funds for the EMP debt service ever came from the resources of either Licata or First Connecticut. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert).

It was always Mocco's intention to replace the acquisition financing with long term financing. To that end, from the date his Plan was confirmed forward, Mocco zealously sought to secure long-term financing of the properties that were titled in the LLCs. For example, Mocco secured permanent financing from Nomura Bank on the Hamilton Park property in November 1996, obtained long-term financing from GE Capital on the A-1 Storage property shortly thereafter, and used the net proceeds from both loans to pay down the EMP acquisition debt. The record reflects that by the spring of 1998, Mocco had replaced all the EMP acquisition debt with long-term financing. See, e.g., Tr. 2/10/04 p.m. at pp. 124 (Mocco).

### (iii) Sworn Schedules Evidencing Licata's Lack of Ownership

Although not determinative on their own, this Court finds the statements Licata made under penalty of perjury in his own chapter 11 case to be useful in the Court's disentangling of the web created by the unusual transactions between Mocco and Licata, and to shed further light on the question of whether Licata owned the LLCs. Licata asserts that he owned the LLCs and had authority to file bankruptcy petitions for the LLCs in September 2002. However, the schedules attached to the Statement of Financial Affairs in his personal bankruptcy case clearly indicate that from 1997 forward he had no ownership interest in any of those LLCs. See Ex. —63, Notice of Filings Schedules and Statement of Financial Affairs Affidavit, with excerpts and Attachment to Schedule A to Chapter 11 Bankruptcy Petition, Licata Personal Bankruptcy (July 2002).

During his testimony in this proceeding, Licata acknowledged both the authenticity of his signature on the bankruptcy petition, statements and schedules, as well as the fact of his representation in the schedules that he did not own the LLCs on the date of his chapter 11 filing. He interchangeably protested that the schedules were in error, that he did not read them before he signed them, and that he thought he had amended them. However, the record is clear that Licata did not amend his bankruptcy schedules to change this

representation about the LLC:. Moreover, the Court does not believe Licata's testimony that he did not read the schedules before he signed them nor Licate's claim that he signed whatever documents were put in front of him without examination. *If, e.g.*, Tr. 2/19/04 at pp. 57-58 (Oper) (testifying that it was Licata's practice to review and mark up every document that crossed his desk). As required by the bankruptcy rules, Licata signed his personal bankruptcy petition under penalty of perjury. "The Bankruptcy Code expects that when debtors and their attorneys are finalizing and signing their schedules, they will devote their full attention to them in order to ensure that they are complete and accurate to the best of the debtor's knowledge and information." In re Piasinski, 290 B.R. 16, 26-27 (Bankr. W.D.N.Y. 2003); see also Suggitt v. French (In re French), 2003 WL 21288644 (Bankr. D. Vt. May 30, 2003). "To allow debtors to ignore the seriousness of their oath, submit documents to the court which contain numerous material inaccuracies, and, when the inaccuracies are discovered, excuse their behavior because they claim they failed to read the documents before signing them under oath, would undermine the whole structure of the system." Jordan v. Bren (In re Bren), 303 B.R. 610, 616 (B.A.P. 8th Cir. 2004). Thus, it is this Court's finding that Licata is bound by the statements he made under penalty of perjury that he did not have any ownership interest in the LLCs in July 2002 when he personally filed for bankruptcy protection.

### C. The Question of Good Faith

The seminal case on the question of a whether a debtor's case was filed in good faith is Matter of Little Creek Development Co., 779 F.2d 1068 (5th Cir. 1986), in which the Fifth Circuit Court of Appeals propounded the following comprehensive analysis:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of property. There are sometimes

allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith.

Id. at 1072-73. The Second Circuit relies on a very similar list of facts when considering whether a debtor's filing was in bad faith:

> (1)   the debtor has only one asset;
> (2)   the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3)   the debtor's one asset is the subject of a foreclosure action as a result of arrearages of default on the debt;
> (4)   the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5)   the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6)   the debtor has little or no cash flow;
> (7)   the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8)   the debtor has no employees.

See In re C-TC 9th Avenue P'ship, 113 F.3d 1304, 1311 (2d Cir. 1997) (quoting Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp., 139 B.R. 828, 832 (W.D. Ky. 1992), and citing Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394-95 (11th Cir. 1988)); Little Creek, 779 F.2d at 1072-73); see also, In re Laguna Assoc. Ltd. P'ship, 30 F.3d 734, 737 (5th Cir. 1994) (listing similar factors to consider when determining whether a chapter 11 case is filed in bad faith).

Here, each LLC was established as a bankruptcy-remote entity that held title to one distinct piece of real property. None of the LLC's ever had employees. Credible testimony by Mocco established that none of the LLCs ever had a bank account. See Tr. 2/10/04 at pp. 89-90 (Mocco). As of the bankruptcy filing date for each LLC, Licata had no ownership interest in the LLCs; yet, he was representing that the properties held by the LLCs were his. Credible testimony by Mocco established that the LLCs had few unsecured creditors and that the bills of each LLC were consistently being paid in a timely fashion. See Tr. 2/10/04 at pp. 84-91. There were no foreclosure actions pending or any allegations that the secured debt on any of these parcels was not current. Mocco and Licata were involved in state court litigation regarding the ownership of the property; there were suits pending regarding the amount owed to EMP; and the litigation was proceeding slowly. Of particular importance is the fact that none of this litigation supports the assertion that the LLCs had financial difficulties or, for any reason, required a bankruptcy reorganization. That is not to say, however, that the state

court litigation is wholly unrelated to the filing of these LLC bankruptcy cases. On the contrary, the record discloses that the LLC bankruptcy petitions were filed on the eve of a hearing when the parties expected the state court to resolve the question of who owned the LLCs. Thus, one important result of the LLCs being filed in bankruptcy was that the state court action – and its critical ruling determining ownership of the LLCs—was stayed.

As the Second Circuit stated: "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." In re C-TC 9th Avenue P'ship, 113 F.3d at 1310 (quoting In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985)). Even assuming arguendo that Licata had the authority to file the subject bankruptcy petitions for the LLCs (which the Court finds Licata did not), based on the credible evidence, the Court finds no legitimate reorganization purpose to be served by the filing; each LLC was a viable entity that had been promptly servicing its debt obligations and paying all of its other bills in a timely manner. See, e.g., Tr. 2/10/04 (pm) at pp. 84-91 (Mocco); Tr. 2/19/04 at pp. 42-43 (Opert). The Court finds that the only purpose accomplished by the filing of the LLC petitions was a spurious one: it allowed Licata to stay state court litigation which might have definitively defeated his claimed ownership interest in these properties.[14]

Thus, based on the ample record before it, the Court finds, as an alternative ground for dismissal, that Licata's filing of the LLCs under chapter 11 of the Bankruptcy Code was in bad faith.

### D. Equitable Considerations and State Court Proceedings

Licata argues that even if this Court finds that he did not own the LLCs at the time of filing and even if it appears that he may not have filed the cases in good faith, Mocco's Motion to Dismiss should be denied because of Mocco's bad faith. Alternatively, Licata asserts that to the extent Mocco did own the properties at some relevant point in time, Mocco's ownership was revoked by the state court in September 2001, about ten months before Licata filed his own and the LLCs' bankruptcy cases. The Court finds no merit in either argument.

### (1) Mocco's Alleged Bad Faith

Licata vigorously argues that great weight should be given to the fact that at the final confirmation hearing neither Mocco nor his attorneys disclosed to the bankruptcy court Licata's identity as the nominee

---

[14] The Bankruptcy Court is not endowed with exclusive jurisdiction over litigation involving these LLCs. If the LLC bankruptcy cases are dismissed upon a finding that Licata did not own the LLCs, the suit in the New Jersey state court will no longer be stayed and that court can resolve the issues remaining between these parties and involving the debts secured by these properties.

owner of the LLCs, the relationship between Licata and the lender, nor the existence of the 3-page agreement. Licata insists that Mocco's failure to disclose this information, particularly the failure to disclose the 3-page agreement, constitutes such outrageous bad faith that it should bar Mocco from the relief he seeks herein, regardless of whether he owned the LLGs on the date Licata filed each LLC into bankruptcy. First, the Court finds this is not the proper forum and Licata is not the proper party to raise Mocco's alleged bad faith for not disclosing the 3-page agreement in his personal bankruptcy case. Licata suffered no injury from the non-disclosure; he benefitted from it. See generally, Hirsh v. Arthur Anderson & Co., 72 F.3d 1085 (2d Cir. 1995) ("where creditors have . . . a claim for injury that is particularized as to them, they are exclusively entitle to pursue that claim, . . ."). Second, the Court is persuaded by Mocco's *in pari delicto* rebuttal to this argument: Licata is equally culpable for the non-disclosure of the 3-page agreement as Mocco is. As a party to the 3-page agreement, Licata could have informed the bankruptcy court of its existence, but he did not. See generally, Pinter v. Dahl, 486 U.S. 622, 632, 108 S. Ct. 2063, 2070 (1988) ("The equitable defense of *in pari delicto*, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct."). Third, even if this Court found Licata had standing to raise the issue of Mocco's bad faith at this time, having reviewed the transcript of the confirmation hearing, see Ex. D-10, the Court would find, on the merits, that Licata's argument takes the statements of Mocco's counsel out of context and that there was no fraud perpetrated on the bankruptcy court by Mocco's failure to disclose the 3-page agreement.

Licata also vehemently argues that Mocco's failure to sign the 3-page agreement is another indicia of Mocco's bad faith. However, as noted above, this Court finds that there was no legal benefit lost by virtue of Mocco's failure to sign that agreement: he acted as if he was bound by it and he fulfilled his obligations under it. Licata has failed to demonstrate how Mocco's failure to sign the agreement establishes fraudulent intent or bad faith by Mocco.

### (ii) The State Court Order Directing Turnover of Ownership Documents to a Receiver

Licata's assertion that the New Jersey state court order directing Mocco to surrender the LLCs' certificates to a state court receiver effected a revocation of Mocco's ownership is also without merit. The tone and content of the state court order patently communicates that the state court's rationale for demanding the title documents be turned over to a receiver was to maintain the *status quo* and prohibit the property from being encumbered or transferred. The order provided, *inter alia*:

> 4.    Peter Mocco and Lorraine Mocco shall, within seven (7) days (i.e., on or before September 14, 2002) physically deliver to Dennis Drasco, Esquire, the originals of all materials delivered to them by Pieter de Jong on or about September 1, 2001. Those materials consist, in

> general, of unit powers, units of interests in LLCs and replacement
> units for the "Holding Entity" LLCs referenced in the Mocco
> Complaint in Action No. 2. Mr. Drasco shall hold these materials until
> further Order of the Court, and shall provide copies of such material to
> counsel for the Licata parties.
>
> 5.      Pending further order of this Court, or should the Bankruptcy Court
> assume jurisdiction of this matter, the order of the Bankruptcy Court,
> no party or any affiliate of a party shall transfer, lien, or encumber any
> interest in any of the Holding Entity LLCs or any properties owned in
> the name of any such Holding LLCs.  The Order set forth in this
> paragraph does not apply to the property known as the Atrium.

Peter Mocco et al., v. James Licata et al., No. ESX-C-397-99, Order (N.J. Super. Ct. Ch. Div. (Essex) Sept.
21, 2001) (Levy, J.), Ex.3.

Licata's insistence that this order has an impact on ownership is unfounded.  The critical issue raised
by this order is who owned the property at the time of its entry, that is to say, what was the *status quo* that the
order sought to preserve.  This Court finds that Mocco was the owner of the property at the time the state court
entered its order.  While it is true that the New Jersey state court very deliberately restricted Mocco's – as well
as Licata's – ability to manipulate legal title to the property, its order preserved the title to the property as it
existed as of that date.  As is clear from its order, if the matter were brought within the jurisdiction of the
bankruptcy court, the New Jersey Superior Court would make no determination regarding the ownership of
properties until after the bankruptcy-related issues were resolved by the bankruptcy court.  Thus, but for the
bankruptcy issues raised, the state court would have proceeded in the fall of 2001 to determine who owned
the properties.  In July 2002, while the state court, Mocco, and Licata were waiting for the bankruptcy court's
ruling, Licata personally filed for bankruptcy protection and, in September 2002, he caused the LLCs to file
for bankruptcy protection.  As a result of these bankruptcy filings, this Court, rather than the New Jersey state
court, will determine ownership.  And, as a result of the state court's order, title to the properties have
remained undisturbed while this Court has considered and determined the ownership of the LLCs.

For the reasons set forth above, this Court finds that Licata has failed to prove Mocco acted in bad
faith or that Mocco's conduct warrants denial of the Motion to Dismiss.

## II. CONCLUSION

### A. Conclusions of Law

1.      Under 11 U.S.C. §§ 1112(b) and 305(a), a chapter 11 petition may be dismissed only "for cause," and
may not be dismissed if it was filed in "good faith."  See In re C-TC 9th Ave. P'ship, 113 F.3d 1304,
1311 (2d Cir. 1997).

2.    As the moving party under 11 U.S.C. §§ 1112(b) and 305(a), Mocco bears the burden of making a *prima facie* showing of bad faith.  See RUSSEL, BANKRUPTCY EVIDENCE MANUAL, 2001 Ed., § 301.82(B). Based on the facts of this case, the Court concludes Mocco has met his burden.

3.    No single factor is determinative on the issue of good faith filing. The Court must examine the facts and circumstances of each case against established guidelines. See In re C-TC 9th Avenue P'ship, 113 F.3d 1304 (2d Cir. 1997); In re HBA East, Inc., 87 B.R. 248, 259 (Bankr. E.D.N.Y. 1988).

4.    Licata's interest in the subject properties never exceeded that of a nominee. LiButti v. United States, 968 F. Supp. 71, 76 (N.D.N.Y. 1997),[15] aff'd in part and rev'd in part on other grounds, 178 F.3d 114 (2d Cir. 1999).

5.    Since the LLCs were formed under the New Jersey Limited Liability Act and because the operating agreements for the LLCs include choice of law provisions specifying New Jersey law, the LLC Act and case law under that Act are controlling. See Restatement (Second) of Conflicts of Law § 302 (1971).

6.    The LLC Act establishes default requirements and standards, but provides the LLC members great discretion to establish the company structure and procedures that match their needs. See Kuhn v. Tumminelli, 2004 WL 139883 at *4 (N.J. Super. Feb. 11, 2004); see also N.J. Stat. Ann. 44:2B-65(a).

7.    The LLC Act does not include mandatory requirements for procedures for determining equitable ownership. However, it expressly permits the use of share certificates as the controlling evidence of LLC ownership. See N.J. Stat. Ann. 42:2B-44.

8.    Focusing on the corporate aspect of the LLCs that gave rise to the present controversy over ownership of the LLCs and, therefore, the properties they hold, established principles and precedent of corporate law control the resolution of this controversy. See David M. Hastings, J.D., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689, at § 2[a].

9.    Under New Jersey case law, it is not necessary for a stock certificate to be issued to a stockholder to evidence ownership since the certificate is merely the evidence of title, and not the property itself. See Piechowski v. Matares, 54 N.J. Super. 333, 343 (1959); see also Crouse v. Agorganic, Inc., No. A-5877-01T5, slip op. at 10 (N.J. Super. Sept. 30, 2003); Abraham v. Township of Teaneck Ethics Bd., 349 N.J. Super. 374, 380 (2002).

---

[15]  Having found in a proceeding below that New Jersey's substantive law applied, the district court instructed in this case that it found no reported New Jersey cases addressing the factors relevant to the nominee theory.  See LiButti, 968 F. Supp., at 75.  Therefore, it would apply factors used by other courts that have considered the nominee theory.  See id.; Towers Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1454 (D. Mont. 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993); Hill v. United States, 844 F. Supp. 263, 271 (W.D.N.C. 1993)).

10     There are no express provisions in the LLCs' respective operating agreements prohibiting the transfer of ownership by means other than the issuance of certificates. The certificate ledgers served as the books and records of the LLCs regarding the recording of ownership of the LLCs. See Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 163 (1984) (citations omitted).

11.    The 3-page agreement is valid and enforceable, based upon principles of promissory estoppel.

12     The execution of the May 1997 Escrow Agreement effectuated the transfer of ownership interest away from Licata because, in conjunction with the execution of the Escrow Agreement, Licata also executed an irrevocable Limited Power of Attorney that bestowed on Pieter de Jong the authority to issue replacement certificates to such person or entity that Mocco designated.

13.    De Jong's September 2001 delivery to Mocco of LLC certificates and records pursuant to the Escrow Agreement further evidenced the transfer of ownership interest away from Licata, the conditions of the Escrow Agreement having been satisfied.

14.    Mocco has met his burden of making a *prima facie* showing that Licata's ownership interests in the LLCs were transferred prior to the LLCs' petition date.

15.    Licata had no ownership interest in the LLCs as of the date he filed the LLC bankruptcy petitions.

16.    Mocco has met his burden of making a *prima facie* showing that the petitions for the LLCs were unauthorized.

17.    Mocco has met his burden of making a *prima facie* showing of "bad faith" in Licata's filing of the LLC's bankruptcy petitions.

18.    The September 21, 2001 New Jersey state court order issued in *Peter Mocco et al., v. James Licata et al.,* No. ESX-C-397-99, did not change the ownership of the properties held in the LLCs.

19.    Since neither Licata nor Mocco disclosed the 3-page agreement to the New Jersey bankruptcy court, Mocco's failure to disclose it is not a basis for denying the relief now sought by Mocco.

20.    Licata has failed to establish fraudulent intent or fraud by Mocco sufficient to deny the Motion to Dismiss.

### B. Summary

Based on the record before it, the Court finds that Licata had no ownership interest in the LLCs as of the date he filed the LLC bankruptcy petitions. Licata's title to the subject properties was always as Mocco's nominee only; the LLCs served merely as a conduit into which Mocco transferred his real property for later reconveyance to him or his designee. This conclusion is bolstered by Licata's own sworn statement in his personal bankruptcy schedules where he indicated he had no ownership interest in these LLCs on the relevant dates. The record of certificate transfers also evidences Mocco's ownership of the LLCs as of September 1,

2001. Neither the alleged bad faith of Mocco nor the state court order demanding surrender of the share certificates deprived Mocco of his ownership rights. Thus, the Court concludes that Licata had not a scintilla of authority to file these chapter 11 cases on behalf of these LLCs.

Independently, and as an alternate ground for granting relief, the Court finds the petitions of the LLCs were filed by Licata in bad faith. There was no legitimate reorganization purpose to be served by the filings. Rather, the Court finds that Licata's primary, if not sole, motivation in filing the LLC bankruptcy cases was to attempt to retain possession and control over property in which he had no ownership rights and distribute the proceeds of this property to his creditors.

Thus, the Court grants the Moccos' Motion to Dismiss.

### C. *Ruling on Requests for Findings and Conclusions*

#### (1) Debtors' Proposed Findings of Fact and Conclusions of Law (doc. # 100)

GRANTED *in toto* – 1–3, 5–11, 13-14, 17–24, 26, 28–30, 32–41, 44–48, 51–52, 54, 57–60, 63-73, 75, 77–79, 82–86, 89, 93–95, 97, 99–100, 104, 106–109, 111–116, 126-127, 130, 133, 135, 138–149, (A)–(G), (L).

GRANTED with exceptions or caveats (as noted) –

4 (except that Mocco owed First Union approximately $44 million),

12 (first and third sentences only),

16 (first and second sentences only),

25 (without the introductory phrase "Reflecting Licata's and his staff's understanding of the contemplated arrangement,"),

31 (without the introductory phrase "Again reflecting its understanding of the transaction,"),

61 (except that "First Union" should read "First Connecticut"),

62 (except that in the first sentence, "First Union" should read "First Connecticut"),

74 (without footnote 5),

76 (first and second sentences, and third sentence ending after the word "projects"),

88 (first sentence only),

92 (To read: "Licata caused the establishment of limited liability companies, including the subject LLCs, and registered them under New Jersey law."),

101 (excluding last sentence),

103 (excluding last sentence),

131 (with sentence to end after the word "properties"),

132 (with sentence to end after "August 1998").

DENIED[16] – 15, 27, 42–43, 49–50, 53, 55–56, 80–81, 87, 90–91, 96, 98, 102, 105, 110, 117–125, 128–129, 134, 136–137, (H)–(K), (M)–(Y).

   (ii) Moccos' Proposed Findings of Fact and Conclusions of Law (doc. # 98)

GRANTED *in toto* – I:1–2, II:1–2, III:1–3, IV:1, 1.1–1.16, 1.18–1.40, 2.1–2.5, 2.7–2.13, 3.1–3.5, 3.7–3.9, 3.11, 4:A–L, 4:N–S, A.1–A.14, A.18, A.20, B.1–B.17A.3, B.17A.6, B17A.8, B18, C.1.A, C.1.A.2, C.1.A.3, C.1.B.1, C.1.0, D.1, D.4–10, E.2, E.3, E.9–E.9.4, E.10, E.11, F.2, F.3, G.1–2.A, G.3.

GRANTED with exceptions or caveats (as noted) –

    2.6 (except that in the second sentence, the phrase "so long as" is replaced with "after"),

    2.14 (with the deletion of the phrase "repeatedly reaffirmed the terms of the three page agreement and"),

    3.6 (except that in the second sentence, the introductory phrase "In all the descriptions of the deal," is deleted), 3.10 (first sentence only),

    B.17A.4 (first sentence only),

    B.17A.5 (excluding the phrase "and moral"),

    C.1.C (second and third sentences only),

    D.11 (sentence one through three only),

    E.1 (excluding the phrase "which as shown above is fallacious"),

    E.8 (excluding the introductory word "Conspicuously"),

    E.9.5 (except "irregardless" should read "regardless").

DENIED – IV:1.17, 4:M, A.15–A.17, A.19, B.17A.7, C.1.A.1, C.1.A.4–C.1.B, C.1.B.2, C.2, C.2.A–C.2.E, D.2, D.3, D.12, E.4–7, E.12, F.1, F.4–7, G.2.B.

This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

*Colleen A. Brown*

Dated at Rutland, Vermont this 27th day of July 2004.

                                    Colleen A. Brown
                                    United States Bankruptcy Judge

---

[16] The Court's denial of some findings of fact and conclusions of law – as to both parties – is based upon the proposal being either inconsistent with the evidence, immaterial, or set forth in an inflammatory rather than objective tone.

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

In re:                                :
                                      :
FIRST CONNECTICUT CONSULTING          :
GROUP, INC., et al.,                  :
                                      :
          Debtors.                    :
                                      :
_____       :
                                      :
FIRST CONNECTICUT CONSULTING .        :
GROUP, INC., FIRST CONNECTICUT        :
HOLDING GROUP, LLC II, FIRST          :
CONNECTICUT HOLDING GROUP, LLC III,   :
FIRST CONNECTICUT HOLDING GROUP,      :
LLC X, FIRST CONNECTICUT HOLDING      :
GROUP, LLC XI, FIRST CONNECTICUT      :
HOLDING GROUP, LLC XIII,              :
                                      :
          Appellants,                 :
                                      :
              v.                      :    Docket No. 2:04-cv-230
                                      :
PETER MOCCO and LORRAINE MOCCO,       :
                                      :
          Appellees.                  :

## OPINION AND ORDER

The Debtors (collectively "First Conn") appeal from an order

of the United States Bankruptcy Court for the District of Vermont

(Brown, J.) entered on July 27, 2004 that granted Appellees Peter

and Lorraine Mocco's motion to dismiss the Chapter 11 cases of

First Connecticut Holding Group, LLC II, III, X, XI and XIII

(collectively the "LLCs" or the "Debtor LLCs").  The Debtor LLCs

are New Jersey Limited liability companies, whose cases are,

along with several other cases, jointly administered and pending

in the United States Bankruptcy Court for the District of

Connecticut, Bridgeport Division.  The Moccos filed their motion

to dismiss in the Connecticut proceeding, *In re: First Connecticut Consulting Group, Inc.*, No. 02-50852 (AHWS) (Bankr. D. Ct. filed July 12, 2002)," on March 19, 2003. The parties consented to an order transferring venue to the District of Vermont for consideration of the motion, pursuant to 28 U.S.C. § 1412. Following an eight-day trial in February 2004, the Bankruptcy Court granted the Moccos' motion to dismiss, and ordered that its memorandum of decision and order be transmitted to the Bankruptcy Court for the District of Connecticut, Bridgeport Division for docketing in the jointly administered case. First Conn filed a timely notice of appeal on August 16, 2004.[1]

### Jurisdiction and Standard of Review

Section 1412 of Title 28 permits a court to transfer a case or proceeding under title 11 to another district in the interest of justice or for the convenience of the parties. 28 U.S.C.A. § 1412 (West 1993). This Court has jurisdiction under 28 U.S.C. § 158(a) to hear an appeal from a final order of a bankruptcy judge from the District of Vermont. 28 U.S.C.A. § 158(a) (West 1993 & Supp. 2005). A bankruptcy court's dismissal of a Chapter 11 case is a final order. *Cf. C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997) (entertaining

---

[1]  First Conn requested and was granted an extension of its deadline for filing a notice of appeal from August 6 to August 16, 2004.

appeal from dismissal of Chapter 11 petition filed in bad faith).
The bankruptcy judge's findings of fact will be upheld unless
clearly erroneous, with due regard given to her opportunity to
judge the credibility of the witnesses. Fed. R. Bankr. P. 8013.
Conclusions of law are reviewed de novo. *Official Comm. of
Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett
Funding Group, Inc.)*, 146 F.3d 136, 138 (2d Cir. 1998).

### Factual Background

In March and April 1994, the Moccos, business operators and
real estate owners and developers, found themselves in financial
distress and filed for Chapter 11 reorganization for themselves
and some of their business entities in the District of New
Jersey. As of spring 1996, the Moccos' major secured creditor,
First Union National Bank ("First Union"), was pressing for
Chapter 7 conversion, and had filed a competing plan of
reorganization. The Moccos, having submitted a Fourth Amended
Plan of Reorganization, were desperate to have a plan of
reorganization confirmed.

The Moccos concluded that in order to obtain confirmation of
their plan they had to negotiate a buy-out of First Union's
claim, approximately $44 million. They reached an agreement with
First Union on a discounted purchase price, but were unable to
arrange financing within the time frame insisted upon by First
Union. The Moccos decided to seek two-step financing, a short

3

term bridge loan to finance the purchase of the discounted debt,
with permanent financing to follow.

In May 1996 Peter Mocco hired First Connecticut Consulting
Group, Inc. ("FCCG") to arrange the financing the Moccos needed.
FCCG, owned by James and Cynthia Licata, specializes in arranging
financing for financially distressed parties.  Mocco entered into
a consulting agreement with Licata and FCCG, in which, for a
$200,000 consulting fee, Licata was to act as Mocco's agent to
find and secure a bridge loan using one of the Moccos'
properties, the Hamilton Park Health Care Center in Jersey City,
New Jersey, as collateral.  The consulting agreement contemplated
that the Moccos would borrow from a third-party lender engaged by
FCCG and that they would retain ownership of their properties.
At the time, Licata was placing most of FCCG's clients' loans
with BMP Whole Loan, Inc. ("BMP").

On May 23, 1996, FCCG itself agreed to lend up to $16
million in bridge loans to the Moccos to refinance their fourteen
First Union mortgages, using all of the secured properties as
collateral.  The loan commitment letter expressly superseded all
previous discussions or agreements between FCCG and Mocco.

Licata negotiated a price of $22 million for purchase of the
Moccos' First Union mortgages.  Licata also learned that First
Union was not willing to deal with Mocco directly.  First Union's
draft contract for FCCG's purchase of the debt included a

4

covenant that FCCG was not entering into the First Union contract
for the benefit of any other person. In the meantime, FCCG and
EMP were discussing the terms of a loan to FCCG to enable it to
fulfill its loan commitment to Mocco. EMP insisted that it would
not loan money to FCCG if the loans were to be secured by real
property owned by any entity in bankruptcy proceedings. Licata
then threatened to "walk away" from the transaction unless Mocco
agreed to change the structure of the transaction.

Mocco agreed to transfer ownership of the real property to
limited liability companies owned by FCCG. He and Licata agreed
that the LLCs would hold title to the properties in order to
facilitate the reorganization plan and the refinancing, but that
Licata would reconvey title to Mocco or his designee for nominal
consideration after long-term financing was secured.

In connection with FCCG's purchase of the First Union
claims, a "Third Immaterial Modification" to the Moccos' Fourth
Amended Plan was submitted to the New Jersey Bankruptcy Court,
reflecting the transfer of title of the properties to FCCG, new
holder of the First Union claims. The Bankruptcy Court
determined that the change would not adversely affect the
treatment of any creditor, and was only an adjustment between
Mocco and FCCG, to which both had consented.

Then EMP insisted on lending the full $22 million to FCCG,
with Mocco supplying the $6 million difference, not to reduce the

First Union debt but to invest in EMP. Mocco reluctantly agreed
to this condition as well.

Mocco drafted a three-page agreement that reflected the
terms of the understanding between himself and Licata, specifying
that FCCG was acting as negotiator, agent and consultant for
Hamilton Park Health Care Center, Ltd. ("Hamilton Park"), a Mocco
entity; that the conveyance to FCCG was solely to facilitate
paying off the acquisition debt; and that after refinancing FCCG
would reconvey to the Moccos or their designee for nominal
consideration. Hamilton Park was to repay the FCCG loans and to
maintain FCCG in a tax neutral position should FCCG incur
additional tax liability as a result of the transaction. Licata
signed the agreement on September 25, 1996, and the properties
were transferred to limited liability companies registered under
New Jersey law. Attorney Pieter J. de Jong was charged with the
administration of the records of the five LLCs.

On September 25, 1996, the closing on the loan from EMP to
FCCG took place, the closing on the sale of First Union's secured
debt to FCCG took place, and the Moccos' reorganization plan was
confirmed by the New Jersey bankruptcy court.

Repayments to EMP were made from time to time during 1996
and 1997 as the Moccos obtained long-term financing for their
properties. Neither FCCG nor the Licatas ever expended any sums
for debt service or satisfaction of the EMP acquisition loans or

6

Case 2:07-cv-01328-SRB    Document 1-2    Filed 07/10/07    Page 50 of 68

the permanent loans.  The Moccos or their affiliates made all
payments of principal and interest on the acquisition loans and
the refinancings.

In May 1997 Mocco and Licata entered into an escrow
agreement, naming de Jong as their escrow agent.  The stated
purpose of the escrow agreement was to provide for the orderly
transition of title to the properties held by the LLCs as the
properties were refinanced and reconveyed to the Moccos.
According to the terms of the escrow agreement, as each property
was refinanced and EMP released its lien, it was to convey its
ownership interest to the escrow agent.  The escrow agent was
authorized to issue replacement shares for the LLCs to Mocco or
his designee.  The Licatas granted de Jong a limited power of
attorney to enable de Jong to endorse and surrender the member
shares in the LLCs.  Licata also signed an Authorization
Statement instructing EMP to deliver the member certificates to
de Jong as each property was refinanced and released from the
lien.  Licata also re-executed the three-page agreement from
September 1996.

Although the properties were refinanced and EMP's liens
released in 1997, Mocco did not seek reconveyance of the
ownership interests in the five LLCs until August 25, 1998.  On
December 16, 1998, Licata and Mocco directed de Jong to forward
to Mocco the remaining documents necessary to reconvey the LLCs

7

Case 2:07-cv-01328-SRB    Document 1-2    Filed 07/10/07    Page 51 of 68

to Mocco.  On January 19, 1999, however, Licata advised Mocco and
de Jong that he would not reconvey the properties.  De Jong did
not deliver the ownership documents to Mocco.

In April 1999 the Moccos brought suit in Essex County
Superior Court, New Jersey, against FCCG, Licata and de Jong to
compel reconveyance of the properties.  In September 2001 de Jong
delivered the ownership documents for the LLCs that he had
previously refused to deliver.  At that time, to preserve the
status quo until a decision could be made regarding ownership of
the LLCs, the Superior Court ordered the Moccos to turn over the
documents to a court-appointed agent, and enjoined all parties
from transferring or encumbering the LLCs or their property,
pending a determination of the ownership interests.  Mocco v.
Licata, No. ESX-C-397-99 (N.J. Super. Ct. Ch. Div. Sept. 21,
2001) (order directing delivery of documents).

FCCG then moved to re-open the Mocco bankruptcy to litigate
the enforceability of Licata's obligation to reconvey.  The
motion was denied.

By June 2002, Licata was in financial difficulty himself,
and he filed for Chapter 11 protection in the District of
Connecticut.  In September 2002 he caused FCCG and all affiliated
entities, including the five LLCs at issue here, to file for
Chapter 11 protection as well.  In his personal bankruptcy
schedules Licata denied having had any ownership interest in the

8

LLCs at any time after 1996, however.

In March 2003, the Moccos moved to dismiss the five Debtor
LLC petitions on the grounds that the Licatas did not own the
Debtor LLC certificates and the filing was unauthorized.  The
Moccos alleged that Licata filed the petitions in bad faith in an
attempt to exercise control over property they did not own, for
the benefit of their creditors and to defeat an imminent ruling
in the state court lawsuit that would have vindicated the Moccos'
claim to ownership of the LLCs.

After a bench trial, the Bankruptcy Court granted the
Moccos' motion to dismiss, holding that Mocco was the owner of
the LLCs at the time Licata filed for Chapter 11 protection, and
that Licata filed the Debtor LLC Chapter 11 petitions in bad
faith.  The Court found that Mocco was a more credible witness
than Licata on all issues, and found Licata's testimony on the
issue of whether he intended to be bound by the three-page
agreement "both disturbing and disingenuous."  Mem. of Decision
at 3, 6.

On appeal First Conn argues (1) that the Bankruptcy Court
could not adjudicate the Licatas' ownership interest in the
Debtor LLCs without formally joining Cynthia and James Licata and
other necessary parties in an adversary proceeding; (2) that the
Moccos at best had an option to re-purchase the properties; (3)
that the agreements are not enforceable because they were not

9

disclosed to the New Jersey bankruptcy court; (4) that the Moccos did not satisfy the conditions to reconveyance that were set forth in the three-page agreement and the escrow agreement; (5) that Mocco breached the escrow agreement by altering the language of the general release; and (6) that the Bankruptcy Court erroneously concluded that Licata filed the Debtor LLC Chapter 11 petitions in bad faith.

## Discussion

### I.   Joinder of James and Cynthia Licata

The matter before the Bankruptcy Court proceeded as a contested motion. First Conn argues that the issue should have been brought as an adversary proceeding that joined James and Cynthia Licata as necessary parties, claiming that the procedure employed by the Bankruptcy Court denied the Licatas "procedural protections afforded by an adversary proceeding," and "deprived the Debtor LLCs and other interested parties of notice of the true nature of the claim." Appellants' Br. at 59, 60. This issue is raised for the first time on appeal.

The Licatas, FCCG and the Debtor LLCs do not claim that they lacked adequate notice of the motion to dismiss the Chapter 11 petitions. Licata, FCCG and the Debtor LLCs are all represented by the same law firm, which participated fully in every stage of the proceedings on the contested motion. The firm did not indicate in any way that its representation was limited. James

10

Case 2:04-cv-00230-WKS    Document 45    Filed 03/28/2006    Page 11 of 25

Licata participated in the proceedings and was a witness at the
hearing on the motion.  Cynthia Licata was permitted to intervene
in the proceedings, and her counsel participated until Cynthia
Licata advised the Bankruptcy Court, through counsel, that she no
longer wanted to participate in the contested motion.  The
Official Committee of Unsecured Creditors for the bankruptcy
estate of James Licata participated through counsel in the
proceedings on this motion.  If there were other interested
parties on the question of who owned the LLC certificates, or
whether the Chapter 11 cases were filed in bad faith, First Conn
has not shown that they were necessary to adjudication of these
issues, nor has it demonstrated that they lacked notice of the
proceedings.[2]

Adversary proceedings are defined in Rule 7001.  First Conn
contends that Rule 7001(2) and (9) require that the Moccos'
motion to dismiss be brought as an adversary proceeding, because
in actuality it was a proceeding to determine the validity of an
interest in property by obtaining a declaratory judgment.  See
Fed. R. Bankr. P. 7001(2), (9).  The Moccos sought dismissal for

---

[2]  First Conn suggests that EMP and Titan Management, an
affiliate of EMP, were necessary parties, but has not specified
why they were necessary to a determination of ownership of the
LLC certificates, or bad faith, or how First Conn was prejudiced
by their absence from the proceedings.  That these entities may
have been able to provide information relevant to whether the
interim financing had been paid in full, or held a different
opinion on the issue, does not render them necessary parties.

11

cause, not declaratory judgment, and their motion was properly
brought under 11 U.S.C. § 1112(b).  Rule 9014 governs a
proceeding to dismiss a case under § 1112(b).  Fed. R. Bankr. P.
1017(f).

Rule 9014 requires reasonable notice and opportunity to be
heard be afforded the party against whom relief is sought.  This
was provided; in fact, this contested motion was conducted
similarly to an adversarial proceeding, with full discovery,
motions in limine, and pre-trial motions for summary disposition.
First Conn has not identified any procedural protections that
were not afforded the Licatas or FCCG.

Given that First Conn participated fully in the proceedings
before the Bankruptcy Court, the gravamen of its argument is that
the adjudication of ownership of the LLC certificates was
procedurally defective.  Its citation to *Chittenden Trust Co. v.
Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*, 135 B.R. 762
(D. Vt. 1991) is inapposite, however.  *Vermont Toy* involved a
marshaling action in which the bankruptcy judge merged the assets
of the debtor company and its sole shareholder.  On appeal the
district court held that the marshaling action was defective
because the shareholder was not a party to the action and his
personal assets were not subject to the bankruptcy court's
jurisdiction.  135 B.R. at 768-69.  The Moccos' motion sought
dismissal of the Debtor LLCs' chapter 11 petitions.  The

bankruptcy court unquestionably had jurisdiction over the assets
at issue, the Debtor LLCs. Moreover, unlike in *Vermont Toy*, the
issues were thoroughly framed and addressed in the submissions to
the bankruptcy court and in the testimony of the witnesses. *See
id.* at 769 (pleadings did not mention marshaling doctrine or
piercing corporate veil; extraordinary application of marshaling
doctrine not foreseeable to shareholder or other creditors).

The Bankruptcy Court properly adjudicated this matter as a
contested motion, and afforded more than adequate notice and an
opportunity to be heard to the Licatas, FCCG and their creditors.
First Conn has not shown prejudice to the interests of any party
or non-party.[2]

## II.  Ownership of the Debtor LLCs

The Bankruptcy Court found that the Debtor LLCs created on
September 12, 1996 were intended to be bankruptcy-remote entities
that would hold title to the Moccos' properties. They were
established in New Jersey and were governed by the laws of New
Jersey. The operating agreement of each LLC contained a
requirement that agreement of all members was required in order

---

[2]  Even were this Court to conclude that this matter should have
been brought as an adversary proceeding, the error is harmless,
given the utter absence of prejudice to the Licatas, FCCG or
their creditors by proceeding on contested motion with full
discovery and an eight-day hearing on the merits. *See In re Orfa
Corp. of Phila.*, 170 B.R. 257, 275-76 (E.D. Pa. 1994) (citing *In
re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989)
(citing cases)).

to effect the transfer of any member's interest, but there was no
procedure specified for the transfer of an ownership interest.
For each LLC there was a certificate book and a certificate
ledger. Certificates were issued for each LLC and recorded in
the appropriate ledger.

The Bankruptcy Court found that pursuant to the May 1997
escrow agreement Licata granted de Jong a limited power of
attorney to endorse the member/shareholder share certificates
issued in his name, and he also authorized EMP to deliver all
ownership shares to the LLC upon EMP's release of the liens
pertaining to each property. De Jong was further authorized to
issue replacement shares to the Moccos or their designee. By
executing the escrow agreement the existing members agreed to
transfer their interests in the Debtor LLCs. The issuance and
transfer of certificates to the Moccos' designee were documented
in the ledgers, but not all of the certificates were endorsed.
The Bankruptcy Court noted that there was no additional evidence
in the LLC records of transfer of ownership, such as minutes of
member meetings or resolutions adopted by the members or
amendments of the operating agreements.

With the operating agreements and the New Jersey Limited
Liability Act silent on the issue of how to effect the transfer
of an ownership interest, the Bankruptcy Court turned to
analogous law in the context of corporations or partnerships.

14

The Court concluded that these LLCs were most similar to closely-held corporations on the issue of ownership interests and their transfer. The Bankruptcy Court reasoned because under New Jersey law a stock certificate is not required to establish ownership rights to a closely-held corporation, the failure to transfer certificates to the Moccos or their designee did not defeat their claim of ownership. The Court concluded that according to the certificate ledger, the Moccos were the record owners of the LLCs as of September 1, 2001 and thus were the owners of the properties held by the LLCs. Mem. of Decision at 11.

First Conn has not challenged this conclusion on appeal. Instead, it argues that the 1996 arrangement set forth in the three-page agreement at best gave the Moccos an option to re-purchase the commercial properties for a nominal sum once they had fulfilled their part of the bargain. It contends as an initial matter that the Bankruptcy Court's characterization of Licata as the Moccos' nominee was error, and violates the terms of their confirmed plan of reorganization, "and therefore violates basic principles of res judicata." Appellants' Br. at 22.

Under the Moccos' confirmed plan, they were to convey five commercial properties to the Debtor LLCs, "free and clear of all claims, liens and encumbrances incurred by or asserted against the debtors except as otherwise provided in the Plan and the

15

Third Immaterial Modification."  The Moccos did so.

A confirmation plan binds debtors and creditors as to all of
its provisions and all related claims which could have been
litigated in the same cause of action.  *Sure-Snap Corp. v. State
St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991).  As of
the date of the confirmation, September 26, 1996, the
understanding between Licata and the Moccos, as evidenced by the
three-page agreement, was that the conveyance to FCCG was solely
to facilitate paying off the acquisition debt, and that the
properties would be reconveyed to the Moccos or their designee
for nominal consideration once the properties were refinanced.
There was no claim against Licata or FCCG for the Moccos to
litigate until Licata refused to convey in 1999, and consequently
res judicata does not bar the Moccos' seeking a determination of
their ownership of the Debtor LLCs as of 2002.

Moreover, the Bankruptcy Court's characterization of the
relationship between the Moccos and Licata and FCCG in 1996 is
not essential to her conclusion that the Moccos were the owners
of the Debtor LLCs by September 2001.  Whatever ownership
interest FCCG and the Licatas had in the Debtor LLCs in 1996, in
May 1997 when FCCG and the Licatas entered into the escrow
agreement, they authorized the surrender of their ownership
shares upon EMP's release of the shares.  In July 1998
refinancing was complete and EMP had released the collateral.

16

Escrow agent de Jong proceeded to record changes of ownership in
the records of the Debtor LLCs, and as of September 1, 2001 the
records reflect that ownership of the shares in the Debtor LLCs
had been transferred to Lorraine Mocco.

First Conn. has not shown error in the Bankruptcy Court's
conclusion that the Moccos are the owners of the Debtor LLCs.

III. Enforceability of agreements

First Conn. also claims error in the Bankruptcy Court's
conclusion that because neither Licata nor Mocco disclosed the
existence of the three-page agreement to the New Jersey
bankruptcy court, Mocco's failure to disclose it should not
preclude him from obtaining relief.

Under the Moccos' Fourth Amended Plan of Reorganization, as
accepted by all their creditors except First Union, the Moccos
retained ownership of all their properties, subject to the
restructured claim of First Union.  Unsecured creditors accepted
their proposed treatment under the plan, and how the Moccos and
First Union restructured their loan was left up to them.  When
FCCG took over the First Union loan, it was understood that the
substance of the plan was not altered.  Accordingly, the New
Jersey bankruptcy court found this modification to the plan
immaterial.  See Fed. R. Bankr. P. 3019 (proposed modification
that does not adversely change treatment of claim of creditor
deemed accepted by all creditors who have previously accepted

17

plan). Changing title to the properties involved in the First
Union claim from the Moccos to FCCG affected only the holder of
the First Union claim, FCCG; and it was fully aware of the terms
of the three-page agreement.

Essentially, First Conn seeks to apply the equitable
doctrine of judicial estoppel to preclude the Moccos from seeking
to enforce the three-page agreement here when they allegedly
denied its existence before the New Jersey bankruptcy court.

Judicial estoppel may apply in "situations where a party
both takes a position that is inconsistent with one taken in a
prior proceeding and has had that earlier position adopted by the
tribunal to which it was advanced." *Uzdavines v. Weeks Marine,
Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (quoting *Stichting v.
Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005)). The later position
must be "clearly inconsistent" with the earlier position, and the
party must have succeeded in persuading a tribunal to accept that
earlier position, *id.* at 147, so that "'the risk of inconsistent
results with its impact on judicial integrity is certain.'" *Id.*
at 148 (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72
(2d Cir. 1997)); *see also Wight v. BankAmerica Corp.*, 219 F.3d
79, 90 (2d Cir. 2000) (no occasion to apply estoppel if
statements can be reconciled). A further consideration is
whether the party seeking to assert the inconsistent position
"would derive an unfair advantage or impose an unfair detriment

18

on the opposing party if not estopped." *Uzdavines*, 418 F.3d at
147 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

   The Bankruptcy Court did not abuse its discretion by
declining to impose judicial estoppel.  The Bankruptcy Court
reviewed the transcript of the confirmation hearing and concluded
that there was no deliberate concealment or fraud upon the New
Jersey bankruptcy court.  Although unnecessary to the resolution
of this issue, this Court reaches the same conclusion.  The
position taken by the Moccos before the New Jersey bankruptcy
court, that they were transferring title to the contested
properties to FCCG, is not clearly inconsistent with the position
taken here, that FCCG held title strictly as a nominee to
facilitate the refinancing of the properties.  The distinction
was immaterial except to the Moccos and FCCG.  There is no risk
of inconsistent results; the New Jersey bankruptcy court was not
asked to rule, and did not rule one way or the other on the
nature of the transferred title.  Finally, there is no unfair
detriment to Licata or FCCG by declining to impose judicial
estoppel; the Moccos seek to enforce what was always the
understanding between Mocco and Licata, that title would be
transferred in order to facilitate the refinancing.

IV.  Conditions for reconveyance

   The Bankruptcy Court found that "[h]aving examined the
Escrow Agreement together with the record . . . [that] the

                              19

conditions of the Escrow Agreement were met such that de Jong, in his capacity as the Escrow Agent, was required to issue documents of ownership to Moccos or his designee." Mem. of Decision at 9. First Conn contends that this finding is clearly erroneous, because the Moccos failed to repay the EMP bridge loan, and failed to provide tax neutral indemnification to Licata.

A.    Repayment of the EMP bridge loan

Under the terms of the escrow agreement, EMP was to release its ownership interest in each Debtor LLC as the properties were refinanced and the proceeds paid to EMP to reduce the balance of the loan.  The escrow agent was then to issue replacement shares to the Moccos or their designee.  Consistent with the escrow agreement, EMP released the liens, and the membership certificates were sent to de Jong to effect a transfer of ownership to the Moccos or their designee.

First Conn makes much of litigation between Licata and EMP over the EMP note, and proofs of claim for $746,979.17 filed by EMP in the Debtor LLC bankruptcies, arguing that there is abundant uncontroverted evidence that the Moccos have not repaid the EMP loan in full.

The Bankruptcy Court acknowledged, however, that there were unresolved disputes over amounts owed to EMP.  She simply found that the escrow agreement provided that the ownership rights were to revert to the Moccos as each property was refinanced and EMP

20

released its liens.

    B.    Tax neutral status

    The agreement to maintain FCCG in a tax neutral position is contained in paragraph 2(F) of the three-page agreement that Licata signed in September 1996 and re-executed in May 1997.[4]

    First Conn devotes several pages of its brief to a theoretical discussion of depreciation, gain and basis calculation. At no time, in submissions to the Bankruptcy Court or this Court on appeal has Licata specified what tax liability he or FCCG has incurred as a result of the transactions specified in the three-page agreement. Licata has not even filed tax returns since 1998. There is no evidence of record that Licata or FCCG has been left other than in a tax neutral position.

    The argument that indemnifying Licata for any tax consequences of the transfer of ownership was a precondition to transfer of ownership borders on the absurd. The hypothetical taxable gain calculated in connection with refinancing the Property owned by LLC II, Appellants' Br. at 38-40, could only

---

[4]  The paragraph reads as follows:
      Hamilton agrees that in all of the above contemplated transactions, exercises, transfers and mortgaging, First Connecticut shall be maintained in a tax neutral position. Thus if First Connecticut incurs any additional tax liability over and above its own tax obligation on its earned interest income and consulting fee income, then in that event Hamilton agrees to make First Connecticut whole.

Case 2:07-cv-01328-SRB    Document 1-2    Filed 07/10/07    Page 65 of 68

have been realized after a transfer of ownership back to the
Moccos. Moreover, the escrow agreement provides for reconveyance
of the properties without regard to tax effects. The Bankruptcy
Court's finding that the conditions of the escrow agreement were
met and that the escrow agent was obligated to transfer ownership
to the Moccos was not clearly erroneous.

V.    Breach of the escrow agreement

The Licatas and the Moccos, as part of the May 1997 escrow
agreement, agreed to execute mutual general releases. The
Bankruptcy Court found that Peter Mocco amended his general
release in favor of the Licatas and FCCG by inserting a
handwritten footnote specifying that the agreements and
obligations regarding the properties meant the escrow agreement
and the documents referred to in the escrow agreement.[5]

First Conn claims that the alteration was a material breach
of the escrow agreement that "excuses or at least suspends the
Licatas' obligation to convey their LLC certificates to Mocco for
$1.00." Appellants' Br. at 53. The Bankruptcy Court rejected
the contention that the alteration constituted a material breach
of the escrow agreement excusing the Licatas from performance.
First Conn has not demonstrated error in that conclusion. The

---

[5]  The releases are held by the escrow agent until he receives a
written termination agreement signed by Mocco and Licata, at
which point the escrow agent is authorized to deliver the general
releases to the parties. The record does not reflect that a
termination agreement has been provided to the escrow agent.

22

Case 2:04-cv-00230-WKS    Document 45    Filed 03/28/2006    Page 23 of 25

Bankruptcy Court was not required to speculate whether Mocco's
unilateral alteration would be effective to limit his release of
FCCG and Licata should Mocco attempt sometime in the future to
establish Licata's liability under other agreements between them
regarding the LLC properties.

VI.    **Bad faith**

Under 11 U.S.C. § 1112(b) and § 305(a), a Chapter 11
petition may be dismissed only "for cause." When the
circumstances surrounding a debtor's Chapter 11 filing indicate a
lack of good faith, its petition may be dismissed. *C-TC 9th Ave.
P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304,
1309 (2d Cir. 1997). Because dismissal for cause, including bad
faith, involves the exercise of a bankruptcy court's equitable
discretion, a dismissal for bad faith is reviewed for abuse of
discretion. *See Cedar Shore Resort, Inc. v. Mueller (In re Cedar
Shore Resort, Inc.)*, 235 F.3d 375, 379 (8th Cir. 2000).

The Bankruptcy Court found as fact that Licata had no
legitimate reorganization purpose to be served by filing Chapter
11 petitions for the Debtor LLCs; rather Licata's purpose in
filing was to attempt to retain possession and control over
property in which he had no ownership rights and to stay state
court litigation which could have defeated his claimed ownership
interest. Mem. of Decision at 15, 20.

First Conn argues that Licata and FCCG had good cause to

23

file for Chapter 11 protection, a fact that has not been
disputed.  It insists that because the Licatas own the Debtor LLC
certificates, either outright or subject to the Moccos'
repurchase option, filing Chapter 11 for the Debtor LLCs was
justified.  It maintains that the Debtor LLCs are crucial to
Licata's own reorganization plan, and the petitions "should not
be dismissed on theory of bad faith filing and abuse of
bankruptcy process, even if they were solvent and filed
bankruptcy petitions shortly before the New Jersey Superior Court
was about to rule on a case dispositive motion."  Appellants' Br.
at 57, citing *Hinsley v. U.I.P. Engineered Prods. Corp. (In re
U.I.P. Engineered Prods. Corp.)*, 831 F.2d 54, 56 (4th Cir. 1987).

     If the Debtor LLCs were wholly owned subsidiaries of FCCG,
then citation to *In re U.I.P. Engineered Products Corp.* might be
more useful, but First Conn's argument that the Debtor LLC
petitions were filed in good faith is simply a disagreement with
the Bankruptcy Court's findings of fact that Licata had no
ownership interest in the Debtor LLCs and knew it at the time he
caused them to file for Chapter 11 protection.  First Conn has
not shown that these findings were clearly erroneous.
Furthermore, in issues of bad faith a bankruptcy court is advised
to use its equitable powers to reach an appropriate result in
individual cases.  *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311
n. 5 (quoting H.R. Rep. No. 95-595, at 405-06 (1977)).  Taking

all of the circumstances into consideration, the Bankruptcy Court
concluded that dismissal of the Debtor LLC Chapter 11 petitions
was warranted, based on Licata's bad faith.  This Court finds no
abuse of discretion.

### Conclusion

The decision of the Bankruptcy Court is affirmed.


Dated at Burlington, Vermont this 28th day of March, 2006.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge

25